AMERICAN NATIONAL BANK OF ENID v. CREWS et al.

No. 28650. May 12, 1942.

Rehearing Denied June 16, 1942.

*126 P. 2d 733.*

54

McKeever, Stewart & McKeever, Roy Elam, and Simons, McKnight, Simons, Mitchell & McKnight, all of Enid, for plaintiff in error.

Christy Russell, of Mattoon, Ill., A. F. Moss and H. R. Young, both of Tulsa, and M. F. Priebe, of Enid, for defendants in error.

CORN, V. C. J. This is an appeal from a judgment rendered by the district court of Garfield county, in an action to recover for conversion of United States bonds, treasury notes, and treasury certificates.

The action is based upon a multitude of transactions carried out over the period of years between June, 1922, and October, 1930. The Crews heirs, plaintiffs, owned certain valuable oil producing lands, concerning which litigation was pending during all this time. The parties, desiring that the production and development should be carried on, entered into a contract regarding the property, which ultimately provided the basis for the present action.

This contract was executed between the Crews heirs and the Garber Refining Company, and in its behalf was executed by G. J. Taft, president, who was also vice president of the Farmers State Bank of Garber and active manager of the bank. The Crews Estate Oil and Gas Producers represented the Crews heirs and children who were the owners of the oil property above referred to.

Under the terms of this contract, the oil produced from this land was to be sold to the Garber Refining Company, the money received therefor to be deposited in the Farmers State Bank, the usual royalty being paid plaintiffs. This contract further provided that the proceeds from the 7/8ths, or working interest, less necessary operation and development expenses, was to be deposited in the Farmers State Bank, in what was to be known as the "Crews Estate Oil and Gas Producers Escrow Account," to be paid over when the litigation concerning the property should be finally settled.

This contract further provided:

"6. It is further understood and agreed that the Farmers State Bank is hereby directed to invest the unused portion of said seven-eighths (7/8) of said purchase price so deposited with it and not used for development purposes in the best bonds and obligations of the United States of America which it is able to obtain at the best obtainable purchase price, and said bonds are to be held in escrow in lieu of said money; that upon the maturing of the interest thereon, the same is to be immediately paid to the party of the first part."

The Farmers State Bank of Garber was under the active management of G. J. Taft, vice president, who was also the president of the Garber Refining Company, and it appears from the record that Taft also had other interests. The contract above mentioned was executed in behalf of the bank by Taft, and he also executed same as president of the refinery. Upon execution of this contract the Garber bank commenced receiving money which was paid for the oil produced, and thereafter began an extensive program of bond buying in behalf of its clients, the Crews heirs, the plaintiffs herein.

This program was carried on for approximately eight years, during which time it involved a multitude of transactions, the total value of which reached well over one-half million dollars.

Under the plan, as carried out by the Garber bank, negotiable United States bonds and securities, payable to bearer, were purchased for the Crews account, being paid for out of the funds of the Crews Estate Oil and Gas Producers Escrow Account, under the terms of the contract of June 13, 1922. From time to time certain of these bonds would mature, and upon maturity would be sold upon the bank's order, and the proceeds paid either directly to the Garber bank, or as directed by the bank to be paid. At various times during this period the Garber bank furnished plaintiffs with statements showing the bonds purchased, and that same were being kept safely, thus the plaintiffs

never had reason to believe their account was not being properly handled.

The bonds purchased with plaintiffs' money were acquired from various sources. Of the entire amount of $534,000 of bonds purchased, $269,000 of these bonds are shown either to have passed through, or to have been handled by, the American National Bank of Enid, defendant herein.

In 1930 the litigation between the Crews heirs and others, which formed the basis for the contract in question, terminated, and a compromise was being effected. A settlement between the Farmers State Bank and these plaintiffs was in order, and G. J. Taft was called upon for a statement and settlement of this escrow account. In one manner or another this was delayed for about one week. The compromise was effected and Taft was informed that his statement of the account would have to be forthcoming. Taft disappeared and was later found, fatally wounded by gunshot, and soon died.

Shortly after Taft was found, fatally wounded, one B. A. Garber and Don Taft, a relative of G. J. Taft, called upon Ralph Crews, trustee for plaintiffs at that time, informed him of Taft's condition, and at that time executed a certain memorandum agreement which will be discussed later.

Thereupon investigation instigated by plaintiffs disclosed that of the large sum of money received under the escrow contract, only a very small portion of the entire amount was on hand, either in cash or bonds, the remainder having been embezzled. Thereafter these plaintiffs filed this action, alleging that the defendant was guilty of, or had aided and abetted, the conversion and embezzlement of the bonds and money representing the proceeds of such bonds.

The trial of the cause to a jury resulted in a verdict for plaintiffs in the sum of $249,000, the amount sued for.

Twenty-two assignments of error are asserted as grounds for reversal of this judgment, although numerous of these are directed at the refusal of the trial court to grant certain requested instructions, and others at some of those given. However, we shall confine our discussion to settlement of the issues we believe to be decisive of the matter on appeal.

The entire appeal is really presented on the basis of three general propositions: First, that the action is barred by the statute of limitations. Second, that the court erred in giving certain requested instructions and in refusing to give certain requested instructions. Third, various assignments of error based entirely upon the claim that the evidence was insufficient to justify the judgment of the trial court.

Of the $534,000 of bonds purchased for the escrow account, the record shows that $514,000 was actually embezzled or dissipated. However, this action is for recovery against defendant only as to that part thereof in which the American National Bank is shown to have actively participated.

Under the first proposition the defendant contends that the present action is barred by the statute of limitations on two grounds: First, that inasmuch as the fraud complained of was first discovered in 1930 and the action begun by Ralph Crews, trustee, in behalf of the Crews heirs, in December, 1931, that the substitution of the present plaintiffs in 1933 constituted a new action, and thus was barred by the statute, requiring an action based upon fraud to be commenced within two years of the discovery of such fraud.

The original action was begun in 1931. In 1933 the trial court allowed an application of the Crews heirs whereby Ralph Crews, Charley Crews, Robert Crews, Everett Crews, Mary Willis, nee Crews, and Amy Tresner, nee Crews, were substituted as plaintiffs, and the name of Ralph Crews, trustee for plaintiffs, was stricken from the petition.

Defendant has directed a portion of its argument toward the trial court's action in this respect. However, under the rule laid down by this court, it is conclusively established that when these

plaintiffs were, by order of the court, substituted for Ralph Crews in 1933, such action related back to the time of filing of the original petition. See Atlas Assurance Co. of London v. Fairchild, 171 Okla. 609, 43 P. 2d 482; Crisp et ux. v. Nunn, 173 Okla. 203, 47 P. 2d 139; McIntire v. Torrance, 185 Okla. 19, 90 P. 2d 17.

We next consider whether the present action was barred by the statute of limitations under subdivision 3. of section 101, O. S. 1931, 12 O.S.A. § 95, which provides:

"Third: Within two years: . . . an action for relief on the ground of fraud —the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud."

We have uniformly held that the statute of limitations does not begin to run until the discovery of the fraud, or until it should have been discovered by the exercise of due diligence. See Limitations of Actions, Key 100 (1). There is a further class of cases dealing with this subject, these being cases where a trustee fails to disclose to the beneficiary that the trustee has misappropriated the subject matter of the trust, or where the fraud is effected in such a manner as to be self-concealing. In such cases it is universally held that the cause of action does not accrue until discovery of the fraud, or until it could have been discovered by the exercise of due diligence.

The defendant contends that the commission of a fraud by the Garber bank, and plaintiffs' failure to discover same, did not toll the running of the statute against the defendant, unless the defendant actively participated in the fraud or aided in the concealment of same. On this basis it is urged that it was necessary to find defendant used actual artifice to prevent knowledge of the facts, or some concealment or misrepresentation, to prevent inquiry by plaintiffs. Supporting this argument it is contended that no evidence exists showing that any transaction joined in by the defendant was covered up or concealed.

Thus, it is seen that defendant's entire argument in this respect is based upon the claim: (1) fraud must have been the fraud of defendant itself; (2) the concealment must have been by the defendant ; (3) the action thereon must have been brought within two years after the discovery of such fraud, otherwise the action is barred.

The defendant relies upon numerous cases from this, and from other jurisdictions, holding that fraud sufficient to toll the running of the statute of limitations must be more than a mere silence, but must necessarily show some trickery or connivance tending to exclude suspicion or inquiry. Waugh v. Guthrie Gas, Light, Fuel & Improvement Co., 37 Okla. 239, 131 P. 174, L.R.A. 1917B, 1253, and related cases holding to the same effect.

In discussing the question of fraud it is to be remembered that of the $534,000 in bonds which was placed with the Farmers State Bank of Garber, $514,000 was lost entirely. In its brief defendant admits this amount was embezzled, and the proceeds dissipated, without anything being received back by the plaintiffs.

The record is so voluminous, and the transactions therein revealed so involved, that it will be impractical to attempt to set forth the entire transaction regarding each bond or parcel of the bonds making up the total embezzled, in an attempt to trace each from its inception to the ultimate disposition of the proceeds. The testimony of the auditor, J. T. Morehead, is uncontradicted as to the total of $249,000, and the showing that this amount did actually pass through defendant's hands during the period mentioned.

This witness's testimony was based entirely upon his audit of the books and records of both the defendant and the Farmers Bank of Garber, and is, in itself, clear, convincing proof that this defendant actively participated in the mishandling of the plaintiffs' bonds and bond account. However, in order to give an idea of the manner in which

defendant participated therein, we shall give brief statements of the transactions which will serve, we believe, to give an insight into the entire scheme of mishandling and misappropriation carried on over this eight-year period.

Throughout the entire course of the auditor's testimony it is revealed: (1) Defendant knew these bonds belonged to plaintiffs; (2) defendant knew, or had means of knowing, that these bonds were not the property of Taft or the Farmers State Bank; (3) defendant received the bonds for safekeeping and issued receipts therefor, and, contrary to the intent and purpose of the deposit for safekeeping, would then use the bonds for its own purposes, without plaintiffs' having knowledge of this mishandling, in fact, concealing the actual use to which the bonds were put, to make it appear the bonds were really being held for safekeeping. Numerous letters from defendant to the Farmers bank demonstrate that defendant knew the identity of the "clients" of the Farmers bank as being the Crews heirs. Insofar as the record is concerned, plaintiffs relied wholly upon the faith of defendant's safekeeping receipts.

Hereafter we shall set out the transactions concerning the bonds. In plaintiffs' brief the bonds are dealt with by exhibits and in presenting the handling of each bond, or parcel of bonds, we shall follow this method of presentation. Each exhibit shows the purchase of bonds with Crews money, deposit in the defendant bank, eventual disposition and the manner and means of mishandling.

Exhibit 68 deals with $30,000 in bonds. These bonds were bought in September, 1922, after negotiations by telephone between defendant and the Farmers bank. Receipts for the bonds were sent from the Federal Reserve Bank in Kansas City to defendant, pending issuance of the bonds. The bonds were sent to the Garber bank and this bank returned them to defendant, who issued a safekeeping receipt. December 29, 1922, defendant wrote Taft that they were selling $37,000 in bonds

they had on hand, including these three bonds for $10,000 each, and crediting the account of the Garber bank. Bonds Nos. 8168-69 of this purchase were included in the $27,000 sale to Mr. and Mrs. M. C. Garber. Bond No. 8170 for $10,000 made up the remainder of the $30,000, and this is referred to as the "Gannon bond," having been sold to one Gannon, although this bond was eventually returned to plaintiffs and they do not seek judgment therefor in this action.

Exhibit 69 deals with $20,000. Bond No. 9208, for $10,000, was recovered by plaintiffs and no judgment is sought herein, nor is it part of the judgment rendered. The remaining $10,000 in bonds was disposed of as follows. Bonds Nos. 2619-20-21-22, for $1,000 each, were sold to Mrs. Lucy Garber. Bonds Nos. 2623-24-25, for $1,000 each, were sold to M. C. Garber. Bonds Nos. 2626-23003-23004, for $1,000 each, were among the $50,000 listed by defendant as security for county funds deposited with defendant. These bonds were sold by defendant on direction of the Garber bank, and the proceeds used to purchase three Liberty Bonds which defendant then wrote had been deposited with the county treasurer "as collateral for county funds deposited in your bank." We do not find any mention of these bonds in the record thereafter.

Exhibit 75 deals with $40,000 in bonds, sent by defendant to the county treasurer for security for county funds, in the list of bonds defendant asked Taft to surrender for this purpose, Taft offering additional bonds if desired. January 7, 1924, the defendant issued a "safekeeping" receipt for these bonds. This in the face of the avowed intention to use these bonds as security for county deposits in the defendant bank, for its own purposes, and while knowing at the time that the bonds belonged to plaintiffs. Bond No. 18116, for $500, was released from the custody receipt upon the direction of the Garber bank, and delivered to the Enid Oil & Pipe Line Company, which company then redelivered the bonds to defendant, to

be turned over to the Garber Refining Company. June 15, 1926, this one bond was sent by defendant to Kansas City for redemption, and the proceeds were credited to the Garber bank, but plaintiffs never received any of the proceeds in their bond account.

Bonds Nos. 7276-77-78, $10,000 each, were returned to the Garber bank and this bank sent them to Kansas City for collection. The Kansas City bank made collection and gave the Garber bank credit therefor, but the record shows plaintiffs never received any of the proceeds.

The record reflects that the remaining $9,500 of bonds in this exhibit were, on June 10, 1925, deposited in the defendant bank by the Garber bank.

Exhibit 76 is composed of $25,000 in bonds. Bonds Nos. 8693-94-95. $5,000 each, were sent by defendant, on order of the Garber bank, to Wichita, Kan., for the use and benefit of a refinery. The bonds were returned from the refinery to the Enid bank, which issued receipts for them. They were later sold and credit given to the Garber bank, but plaintiffs never received any of the proceeds. These bonds are not traced further.

Bond No. 8692, $5,000 and bonds Nos. 2879-80-81 and 10569-70, $1,000 each, were attached to the B. A. Garber note, one of the many notes of certain individuals involved in numerous of these transactions. However, with but one exception, none of these notes ever had any collateral other than plaintiffs' bonds. These numbered bonds were attached to Garber's note as collateral and same was discounted in the National Park Bank in New York City. Then these bonds matured and the National Park Bank sold them and used the proceeds to purchase bond J-00025289 for $10,000. This bond was later returned to the defendant and was sold in Kansas City, but no trace of the proceeds can be found after it was credited to the defendant.

The transaction in regard to this exhibit is particularly interesting, in view of the following circumstances shown by the record, connected with portions of this same exhibit. Defendant held Taft's note, secured by Garber's note. This security evidently did not satisfy defendant, for, on May 2, 1924, evidently confirming some previous arrangement between Taft and Vessels, president of the defendant bank, Vessels wrote Taft as follows:

"I wish to confirm our understanding of recent date wherein you instructed me over the 'phone to transfer $16,000 of the Crews Estate's United States Treasury Notes as collateral to your note for $16,000 held by this bank, and deposit the B. A. Garber note, which we had been holding as collateral to your note, with the papers of the Crews Estate Oil and Gas Company.

"Yours very truly,
"Signed T. E. Vessels,
"TEV:JW                    President."

Then, May 5, 1924, Taft wrote Vessels a letter, stating same was his authority for placing $16,000 of Crews bonds with his (Taft's) note of that amount, and placing the Garber note, collateral to his own note, with the Crews bonds to be held with them as security, in place of the bonds taken from the account.

However, relating to this transaction, the auditor found the following letter in defendant's files, but the letter had apparently never been mailed.

"April 25, 1924
"To The Crews Estate:
"Under the instructions from G. J. Taft, we are today placing the B. A. Garber note in the sum of $16,000, with the Crews Estate Bonds, held in our vault for safe-keeping, and are taking $16,000.00 of the said bonds to be sent with the G. J. Taft note of like amount, to the Federal Reserve Bank of Kansas City, Missouri.

"This transaction was authorized by G. J. Taft, over the telephone, this date, to T. E. Vessels, and is to be confirmed by letter.

"American National Bank
"(Signed) Edna R. Knadler,
"Manager, Bond Department."

This transaction is particularly interesting in view of the following letter, written August 1, 1925, evidently to cover some misunderstanding with the State Bank Commissioner, relative to another transaction. We quote only the pertinent portion of this letter, viz., regarding Taft and Garber's credit rating with this defendant.

"August 1, 1925

"State Bank Commissioner

"Oklahoma City, Oklahoma

"My Dear Sir:

.   .   .   .   .

"In complying with the wishes as suggested by Mr. Wight when in the bank yesterday, you are advised this Bank, knowing the financial responsibility of B. A. Garber and George J. Taft, does not look to the Farmers Bank of Garber, Oklahoma, or its account in this bank for any obligations of B. A. Garber or G. J. Taft. We have in the past charged obligations made by these individuals to the account of the Farmers State Bank here merely as a matter of convenience, but we will accept no obligations from either of these gentlemen, other than such as we will look to them personally to pay, and will not expect the Farmers State Bank of Garber to assume any liability for such obligations unless such instructions are received from the proper officers of the Farmers State Bank.

"We have a very high regard for Mr. Taft and B. A. Garber, and the other owners of the Farmers State Bank, and their business has at all times been satisfactory to us and we feel that knowing and being associated with them as we are, we can safely make the statements contained above. . . .

"Yours very truly,

"TEV:JW                President."

The transaction, and correspondence, above set forth serve to indicate two things: First, although defendant was extending credit to both Taft and Garber, defendant did not feel secure or sufficiently protected by the usual security of these men, and turned to plaintiff's bonds for additional security.

Second, that defendant cannot claim there was never any dealing with the plaintiffs' bonds or anything in regard to these bonds, or handling of the bonds by defendant, which would require plaintiffs to be notified of the transactions carried on. From the foregoing it is to be seen that as early as April, 1924, defendant had positive knowledge of the manner and extent of the handling of plaintiffs' bonds and, had this notice written by defendant to plaintiffs ever reached them, they would have undoubtedly become aware of the mismanagement and mishandling of their bonds, since all of these transactions were deals in which plaintiffs' bonds were used.

The note transactions were always handled in the same manner. Having notes of Taft, Garber, or Smith (cashier of the Garber bank), defendant would take as collateral certain of the bonds it held for "safekeeping." On maturity of such bonds the collateral would be sold and the proceeds applied to payment of the note. These transactions would be made while knowing these individuals' credit was not of the best, and defendant at all times knew these securities belonged to plaintiffs, but were being used to cover notes which defendant did not consider sound.

Surely defendant cannot successfully contend that it had no knowledge of, nor part in, the mishandling which took place, when it continuously took bonds placed with it for "safekeeping" and applied them to covering notes as mentioned heretofore. It was, indeed, very convenient for defendant to have these bonds on hand, especially when it thus was possible to charge the notes against the bonds and have everything in order to present to the bank examiners, as evidenced by the defendant's letter of September 11, 1924, to wit:

"Dear George: Your $16,000.00 note was due here on the 10th. and as we are still looking for the Examiners—they being at the Garfield National at present—we are charging the note to your account and enclose it.

"Will of course be glad to take the matter up again if you need it.

"Yours very truly,
"(Signed) T. E. Vessels,
"President."

Exhibit 77 deals with $25,000 in bonds. January 17, 1923, Vessels, president of defendant bank, wrote the Tradesmens National Bank, Oklahoma City, Okla., advising this bank "at the request of our customers, the Enid Oil and Pipe Line Company," they were shipping $50,000 in United States bonds for the use of the pipe line company, and set forth a list of the bonds, among which are those bonds making up this exhibit. Now the record shows the Enid Oil & Pipe Line Company was a corporation, some of the officers of which were at the time active in the defendant bank.

Defendant acknowledged the Oklahoma City bank's receipt for the bonds. March 22, 1924, defendant returned the receipt, with the authorization of the secretary-treasurer of the pipe line company, and requested that the securities be redelivered to defendant. The bonds dealt with in this exhibit were sold for $25,562.50 by the Tradesmens bank on maturity and defendant given credit therefor. Defendant promptly opened two unauthorized and spurious accounts in its own bank, corresponding to two of the spurious accounts later carried in the Garber bank. Defendant placed the $25,000 in the "Crews Estate Bond Account" and the $562.50 interest was credited to the "Crews Estate Interest Account," notifying the Garber bank of this action. April 11, 1924, defendant suddenly closed the two spurious accounts, transferred the $25,000 to the Garber bank, as well as the interest, where the $25,000 was the opening entry in the spurious "Crews Estate Bond Account" there, but the audit showed plaintiffs never received a cent of the proceeds making up this account.

Exhibit 78 deals with ten bonds, Nos. 15502-12, inclusive, $1,000 each, amounting to $10,000. Defendant sold bonds Nos. 15503-07, inclusive, and ap-plied the proceeds to the Taft note. The record shows that Taft's note was for $7,000, secured by Crews bonds Nos. 15509-11 and other bonds. This note was renewed with the same collateral. Taft later gave a note for $23,000, secured by bonds Nos. 15509-11 and other bonds. The defendant notified the Garber bank that bonds Nos. 15509-11 matured June 11, 1925, and had been sent in for redemption and credited to the Garber bank's account. Attention was called to the fact that the collateral was thereby reduced $3,000 on the note, because of which the Enid bank charged the Garber bank's account this amount and credited this amount as paid on the note.

The record reveals that bonds Nos. 15508 and 15512 were hypothecated with the B. A. Garber note for $24,000. June 18, 1925, the National Park Bank of New York City wrote to Garber, in care of defendant, notifying him it had sold $14,000 of the bonds which were collateral on his note, and applied the proceeds on the note. The defendant then wrote the Garber bank advising it of this sale, including these two numbered bonds. The Garber bank then applied a credit of $637.50, representing interest and interest rebate on the note, to the Crews account. Plaintiffs never received the proceeds of these bonds.

Exhibit 80 represents a total of $20,500 in bonds, and no claim is made here for $500 of this amount. The New England National Bank in Kansas City advised the Garber bank of the purchase of these bonds, $20,000 of which were sent to defendant for "safekeeping." Defendant later enumerated this parcel of bonds in a list rendered the Garber bank, specifying that the list of bonds in this exhibit was held as security for the Taft note.

The defendant later sent bond No. 14826 to Kansas City for redemption and credit to its account, and there is no showing of what became of the proceeds. Defendant then advised the Garber bank that it had cashed matured bonds Nos. 59404-13 and Nos. 14829, and had purchased bonds No. 173571 for

$10,000 and No. 74432 for $5,000, which the defendant then attached to Taft's note as collateral. The $5,000 bond was lost somewhere in these dealings and no further trace is found of it after it was pledged to the defendant's own trust officer as security for trust money on deposit with defendant.

Bond No. 173571 was later pledged as collateral for defendant's own note with the Federal Reserve Bank in Kansas City. This bond was received back by defendant from the Federal Reserve Bank, but is not traced thereafter.

There is no doubt, upon the basis of correspondence and the lists of securities furnished the Garber bank by defendant, but that defendant knew these were plaintiffs' bonds and used them for its own purposes with this knowledge. The examination closing, the bonds making up this exhibit disclosed from the auditor's testimony that the plaintiffs never received back any of these bonds or the proceeds thereof.

Exhibit 81 deals with a parcel of $32,000 of bonds. These bonds were sent defendant by the Garber bank for "safekeeping" with notice they were Crews bonds. The Garber bank wrote defendant directing it to release from escrow bonds Nos. 67825 and 70132, for $1,000 each, and Nos. 10069 and 10319, $5,000 each, and attach same to the B. A. Garber note, the proceeds of the note to be placed to the credit of the Garber bank. The National Park Bank then wrote Garber in care of the defendant, advising it had sold $14,000 of these bonds, of which $2,000 was considered in exhibit 77, and including $12,000 here, and had applied same on his note. Defendant then wrote the Garber bank advising it that this sale had been made and the proceeds applied to the Garber note, and remitting $637.50 interest which was to be credited to the Crews account.

The remaining amount of this exhibit, $20,000, was represented by bonds Nos. 5651-52. The record shows that G. G. Smith, cashier of the Garber bank, notified defendant to redeliver these bonds to the Garber bank, May 10, 1924. This same day Smith made his note to defendant for $20,000 and attached these same bonds as collateral. Defendant sent the note to the Fidelity National Bank in Kansas City for rediscount to its own credit, and then had Smith's account in the Metals and Mechanic's Bank in New York credited with this amount. June 2, 1924, Smith renewed his note to defendant and this note was sent through the Fidelity National in Kansas City. The bonds were then released by defendant, who knew they were plaintiffs' bonds, and they were returned to the Farmers Bank of Garber, where they were subsequently put up with the county treasurer as security for county funds deposited in the Garber bank. However, they were finally received back from the county treasurer and were sold by the New England bank for the credit of the Garber bank, but plaintiffs never received any of the proceeds of the sale.

Exhibit 82 is a parcel of $12,000 in bonds. These bonds were purchased directly from a Kansas City bank by the Garber bank. October 22, 1924, defendant issued its "safekeeping" receipt for this particular list of bonds. They were purchased with Crews money and were part of the parcel of bonds released to the Garber Refinery along with other bonds which defendant knew belonged to plaintiffs. The record shows that defendant sent these bonds in for redemption and purportedly credited them to the account of the Garber bank, but plaintiffs never received the proceeds.

Exhibit 83 is made up of $10,000 in bonds, purchased by the Garber bank from the New England National Bank in Kansas City. Defendant acknowledged receipt of a parcel of $30,000 in bonds, subject to order of the Garber bank, and these bonds were included in this list. Defendant later notified the Garber bank of the sale of these bonds, and application of the proceeds to the Taft and Garber notes that it held. Although these bonds were not identified in the defendant's hands as Crews

bonds, the testimony shows they were purchased with Crews money, and it is unlikely defendant would have sold them and applied the proceeds to notes already secured by Crews bonds unless it knew at the same time the bonds belonged to plaintiffs. In consideration of all the circumstances covering these transactions there is no doubt but that defendant knew it was dealing with plaintiffs' bonds.

Exhibit 84 deals with $20,000 in bonds purchased by the Garber bank from the New England National Bank in Kansas City. These bonds, 4% treasury notes (1944-54 series,) were sent to the defendant for "safekeeping," to the order of the Garber bank, and August 10, 1925, defendant notified the Garber bank it had received the bonds, and:

"In keeping with your instructions we have used the proceeds of this bond purchased to pay off the B. A. Garber note of $20,000.00 given us July 31, and $10,693.00 on the $15,000. note, leaving a balance on the $35,000. transaction of $4,307.00."

The uncontradicted testimony was that plaintiffs' money purchased these bonds, and it was the proceeds of these bonds which also went toward paying the $35,000 "hot draft" of B. A. Garber, which was kept in motion between the Garber bank, the defendant, and a bank in Seattle, Wash., from March, 1925, until August. Taft had drawn a draft on Garber, in Seattle, for $35,000, which was transmitted through the defendant. The Garber bank then charged this amount against defendant and credited Haley, Garber, and Pulse, officers of the refinery, with this amount. Not until June 20, 1925, did defendant credit for this item, when it wrote the Garber bank that it was crediting "your account with the proceeds of $35,000 against B. A. Garber, Metropolitan National Bank, Seattle, . . ."

But the draft was not paid at Seattle, and July 10, 1925, defendant charged this amount back against the Garber bank. This transaction is particularly interesting in view of the letter set out earlier in this opinion, regarding the credit rating the defendant considered these men to have.

Exhibit 86 is composed of $25,000 in bonds purchased by the Garber bank from the Exchange National Bank of Tulsa, Okla. The evidence shows these bonds were purchased with plaintiffs' money. The bonds were finally turned to the defendant bank and defendant later attached these bonds to its own note made to the Federal Reserve Bank in Kansas City, January 27, 1927, as collateral thereto. The auditor's testimony showed that this note was renewed at 15-day intervals over a two-year period. The defendant made the note and paid interest directly to the Federal Reserve Bank at a rate of from 3½% to 4½%. Although the note was paid early in 1929, defendant continued to collect interest from the Garber bank at the rate of 7% until January 15, 1930. The record does not show what ever became of these bonds after they were returned from Kansas City to the defendant bank.

The testimony concluding this transaction was to the effect that no part of the face value of these bonds, nor none of the interest thereon, was ever credited to the Crews Estate Escrow Account, either on the books of the Garber bank or on defendant's books.

The evidence revealed by the auditor showed that of the total of $534,000, the proceeds of one $10,000 bond were paid to the Crews Estate Oil and Gas Account, and one bond was delivered in kind. No judgment is sought herein for these two items, as mentioned heretofore, and this $20,000 for which no judgment is sought is included in the total of $269,000, as shown in the exhibits mentioned.

Of the remainder of this amount, $514,000 was misappropriated during the years covering these transactions, being variously credited among spurious accounts denominated as Crews Estate Bond Account, Crews Interest Account, Escrow Account, B. A. Garber Bond Account, B. A. Garber Note Account, M. C. Garber Note Account, G. J. Taft

Note Account, G. G. Smith Note Account, B. A. Garber Agent Account. From the testimony based upon the books and records of both banks, it is shown that plaintiffs never received anything from the proceeds of the bonds. The sum of $249,000, for which plaintiffs recovered judgment, represents the amount actually shown to have been handled by the defendant and actually lost by plaintiffs thereby.

Because of the magnitude of the matter now on appeal, and the resultant innumerable transactions going to make up the entire picture of the situation, we have not given the entire course of each transaction relating to each bond or parcel of bonds, from the time of acquisition until finally established that they were dissipated. We have, however, attempted to set forth a sufficient part of each transaction, in skeleton form, together with a simple statement regarding the actual transaction in each instance, to give a reasonable insight into the manner and extent of this amazing plan of deliberate mishandling by the defendant, carried on over the eight-year period.

We have heretofore declared the rule to be, and it has been followed consistently by this court, that where one stands in a trust relation to another and, by wrongful and fraudulent representations to the principal, leads the latter to believe that certain acts have been performed when such is not true, then the representations, as calculated, lull the principal into a sense of security, and this conduct is sufficient to toll the statute of limitations. See Farmers State Bank of Ada v. Keen, 66 Okla. 62, 167 P. 207; Harris v. Smith, 149 Okla. 277, 300 P. 392; Mansfield, Brunson, Kemp & Ahrens v. King, 160 Okla. 243, 16 P. 2d 87.

The evidence shows that defendant knew these bonds were the plaintiffs' bonds, and that they were being held by the Farmers State Bank of Garber. Likewise, defendant knew, when dealing with the Garber bank in reference to these bonds, that it was dealing with an agent. Under these circumstances it was defendant's duty to discover whether the authority apparently being exercised with relation to these bonds was, in fact, sufficient to justify the Farmers bank in carrying on the activities in which it was engaged when making use of the bonds. See Kindl v. Doss, 167 Okla. 383, 29 P. 2d 946; Sand Springs Home v. Perin Eng. Co., 173 Okla. 142, 47 P. 2d 142; McCall v. Monarch Royalty Corp., 179 Okla. 213, 64 P. 2d 871, citing Shuler v. Viger, 123 Okla. 110, 252 P. 18.

In Bailey v. Glover, 21 Wall, 342, 22 L. Ed. 636, cited by plaintiffs, and relied upon by this court in Harris v. Smith, supra, the following statement is made:

"To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud, the means by which it is made successful and secure."

The evidence appearing in the record conclusively establishes that: (1) Defendant knew these bonds belonged to plaintiffs, for this is admitted by defendant's correspondence with the Garber bank; (2) knowing these bonds belonged to plaintiffs, defendant joined with Taft in the actual mishandling of these bonds for Taft's own benefit, without making any attempt to ascertain whether he was acting within his authority; (3) knowing these bonds belonged to plaintiffs, defendant knowingly used them for its own purposes; (4) having knowledge from the transactions that Taft was mishandling the bonds, the defendant knowingly joined in such mishandling; (5) plaintiffs never knew, nor had any occasion to learn, what was taking place during the period in which the misappropriation was accomplished.

Undoubtedly plaintiffs were ignorant of the misuse of their funds. The situation was such there was no reason for them to suspect that their estate was being dissipated, especially in view of

the fact that Taft rendered statements to them purporting to show the satisfactory condition of their account.

Under the facts and circumstances in this case, we do not find any merit in defendant's continued assertion that these bonds in question were bearer bonds, transferable by delivery, hence any person having possession was thereby clothed with the indicia of ownership so that those taking from such person took without regard to the manner in which the party negotiating the bonds acquired title thereto.

As an abstract statement of an established principle of law, this is correct. However, in view of the matters set out heretofore, there is no merit in this argument, since it is established by the evidence that defendant knew these bonds were being used for purposes other than the bearer had authority to use them for, and in addition, actually joined in such misuse.

As to those bonds which the American National Bank deposited as collateral for its own purposes, which it thereby converted to its own use, the rule is that it is not relieved of liability for such conversion by thereafter depositing the bonds in the account of the Farmers State Bank. 65 C. J., p. 68, sec. 111; West Tulsa Belt Ry. Co. v. Bell, 54 Okla. 175, 153 P. 622. As to the other bonds hereinabove referred to, as well as those converted by the American National Bank, the defendant is liable under the rule stated in Mitchie on Banks and Banking, vol. 5, sec. 57d, that:

"A bank receiving a deposit from one acting in a trust or representative capacity can not justify a payment to him, if it knows, or facts are presented which, if acted on, would disclose, that the fund is about to be wrongfully and unlawfully diverted from the true owner; and in such case it must refund."

See also, Restatement of the Law of Trusts, sec. 324; 7 C. J. 644; 9 C. J. S. 607; 26 R. C. L. 1316; Dempsey Oil and Gas Co. v. Citizen's Nat. Bank, 110 Okla. 39, 235 P. 1104.

We next direct attention to defendant's argument relating to the assignments of error based upon the trial court's refusal to give requested instructions numbered 1 to 25, inclusive; and upon the giving of instructions numbered 2, 5, 6, 8, 10, 11, 12, 13, 14, 16, 18, 19. Defendant has presented a lengthy brief upon this portion of its claim for reversal. As is the case with the other matters relating to the other issues, defendant has presented a general argument, directed at each group of instructions which make up a particular assignment of error.

Defendant's assignment of error No. 11 is as follows:

"That the trial court below erred in refusing to give the jury instructions requested in writing by the defendant, numbered from 1 to 25, inclusive."

Defendant's requested instruction No. 2 asked the court to charge the jury that certain named defendants had been dismissed from the case, and the jury was to consider the case solely as to the American National Bank. This requested instruction was refused, and such refusal is the first requested instruction set out under assignment of error No. 11. However, there is a total failure by defendant to make any showing wherein it was prejudiced by the refusal to give this instruction, especially in view of the fact that by the first instruction given by the trial court the jury was charged that certain defendants had been dismissed by the court from the case, and the jury was to consider the case solely as to the defendant American National Bank of Enid.

Defendant's requested instruction No. 22 asked the trial court to instruct the jury that at the time of filing the present action same was barred by the statute of limitations, and plaintiffs could not recover, and that the jury should return a verdict for defendant. In view of the conclusion reached heretofore, this requested instruction was clearly erroneous.

This court is committed to the rule

announced in Muskogee Elec. Trac. Co. v. Thompson, 100 Okla. 169, 228 P. 963, that where the refusal to give several requested instructions is the subject of joint assignments of error, the instructions will be examined only so far as is necessary to determine whether any of the requested instructions are erroneous, and properly refused, and if any one of the instructions requested is erroneous, no error is presented by the refusal to give the requested instructions, and this court. is not called upon to examine the other requested instructions. See, also, Florence v. Russell, 105 Okla. 20, 231 P. 301; Cities Service Oil Co. v. Boggs, 170 Okla. 335, 40 P. 2d 638; Railway Express Agency v. Stephens, 183 Okla. 615, 83 P. 2d 858; 4 C. J. S., sec. 344 et seq.

By reason of the rule announced in the cited cases we deem it unnecessary to further consider the remainder of the requested instructions, the refusal of which is the basis for assignment of error No. 11.

Assignment of error No. 12 sets up:

"That the court below erred in giving instructions numbered 2, 5, 8, 10, 11, 12, 13, 14, 16, 18, 19."

By instruction No. 2 the trial court defined "conversion." This action was brought to recover for wrongful conversion of the plaintiffs' bonds. Consequently it was incumbent upon the trial court to properly inform the jury as to what constituted conversion. "Conversion" is defined as being any distinct act of dominion wrongfully exerted over another's property, inconsistent with his rights therein. 65 C. J. sec. 1 et seq.

In Buffalo Farmers' Co-op. Elev. Co. v. Harmon, 95 Okla. 138, 218 P. 698, we explicitly approved an instruction couched in nearly identical language as used in the instruction complained of. We hold this instruction correctly stated the principle of law applicable to the contention made by plaintiffs.

In instruction No. 3 the jury was told that there was evidence defendant received these securities for safekeeping, without compensation, and in this connection the jury was charged that under these circumstances defendant was a gratuitous bailee. Then, by instruction No. 4, the jury was charged that a gratuitous bailee must use slight care for the preservation of the thing bailed, and that it was the duty of the defendant to use that degree of care that an ordinary person would use about his own affairs of slight importance. These two instructions, taken together, fairly apprised the jury of defendant's theory of bailments, when considered with the other instructions given.

Instruction No. 11 charged the jury that, if during the time defendant held these bonds for safekeeping defendant knew the bonds belonged to persons other than the Garber bank, and during this time defendant received orders and directions regarding such bonds, whereby it was revealed that the Garber bank intended to use and appropriate the bonds to its own purposes, then the duty rested upon defendant to ascertain the authority for the Garber bank's right to so appropriate and use the bonds. Further, if defendant's knowledge was that the officers of the Garber bank were misusing, or contemplated misuse or appropriation of, the bonds, and the defendant, without inquiring into the power and authority of the Garber bank and its officers, whether to the profit of the defendant or not, knowingly aided and abetted the Garber bank and it officers in such misappropriation, which resulted in loss to plaintiffs, then the jury would be justified in finding defendant liable to plaintiffs for the loss.

Defendant complains of these instructions on the theory the jury was first instructed that defendant was a gratuitous bailee, and thereafter was instructed that defendant was bound to ascertain the intentions of the Garber bank in regard to these bonds. The argument is that the Garber bank had undoubted authority to purchase bonds and retain possession and control under the terms of the escrow agreement; that the contract was not a matter of record and no constructive notice of its pro-

visions was ever imparted to defendant, and all dealings between defendant and the Garber bank were without reference to any arrangement between the Garber bank and these plaintiffs.

The defendant knew it was dealing with an agent, and in the face of circumstances obviously sufficient to allow defendant to determine whether the Garber bank was mishandling the bonds. It is even more pointless to contend that defendant had no notice of the provisions of this escrow contract, and was only serving as a bailee of the bonds, in the face of the positive evidence that defendant actively participated in the misappropriation. Certainly defendant, knowing it dealt with Taft as an agent, could not close its eyes to the mismanagement and escape responsibility, much less join in the mishandling and then expect to escape on the plea that it was only a gratuitous bailee, without notice of the contract provisions under which the bailor presumed to act, and thus was acting entirely within its own rights.

Defendant contends there was reversible error in the giving of instruction No. 12, by which the jury was told that if they found from the evidence that, during the time complained of, the Garber bank had securities on deposit with other banks besides the defendant, and if from the evidence they found that the Garber bank contemplated misappropriation of the bonds, and in order to accomplish this, directed defendant to procure these bonds from other banks and dispose of same, and thereby aid in the misappropriation and misapplication of such bonds, and if from the evidence it appeared that defendant knew of such intent on the part of the Garber bank, and with such knowledge aided and assisted in this mismanagement, in whole or in part, and same was done with knowledge and assistance of defendant, resulting in loss to the plaintiffs, then the jury would be justified in finding defendant liable for the loss sustained, arising from the transaction or transactions.

The argument made in respect to the

giving of this instruction is merely a reiteration of that made heretofore, to the effect that this instruction violates the rule of law as to the defendant's duties under the circumstances involved, thereby allowing liability to be fastened upon defendant.

Defendant further assigns the giving of instruction No. 8 and instruction No. 14 as reversible error. Instruction No. 8 informed the jury of the giving of a contract by B. A. Garber to plaintiffs, authorizing the sale of real estate and personal property held by the trustee, the proceeds to be applied toward the satisfaction of any loss sustained by plaintiffs by reason of the mishandling of their bonds by the Garber bank. In this connection the defendant's evidence was to the effect that plaintiffs were, by reason of the property turned over to them under this agreement, sufficiently reimbursed for their loss. The jury was charged that this presented a question of fact for their determination, as to whether plaintiffs had been fully compensated for such losses by reason of the contract mentioned.

The agreement referred to, to which reference has been made earlier in this discussion, provided that the parties of the first part, to wit, B. A. Garber and wife and Clyde Pulse and wife, who were officers and stockholders in the Farmers State Bank of Garber and the Garber Refining Company, agreed to turn over to the plaintiffs 2,000 shares of stock in the Washoma Petroleum Company; 2,000 shares of stock in Garber Brothers, Inc.; 120,000 shares of Garber Refining Company stock; 490 shares of Garber Tool & Supply Company stock; 50,000 shares of Bilmont Refining Company stock; valid timber leases in Vancouver, B.C.; a note; a contract; two quarter sections of Garfield county land, and Garber's home in Seattle, Wash. Pulse and wife turned over 1,500 shares of stock in the Washoma Petroleum Company, and other property.

This agreement provided that Ralph Crews and R. L. Williams, trustees for

plaintiffs under this agreement, could sell and dispose of any or all of this property as they deemed to the best interests of plaintiffs, in an effort to reimburse plaintiffs by reason of the loss suffered from the dissipation of their trust account held in the Farmers State Bank of Garber, of which bank B. A. Garber was an officer.

The evidence showed that, although the property listed under this agreement appeared to have an enormous value, in reality the majority of the property was heavily encumbered, or was of uncertain and speculative value, such as the stock in the Washoma Petroleum Company, which appeared on its face to be very valuable. However, the evidence disclosed that the liabilities of the company exceeded the value of the stock, although it was a going concern at the time plaintiffs received the stock, and after receiving same it appears that plaintiffs invested in excess of $100,000 of their own money in an effort to prevent foreclosure of certain obligations of the company. The other property mentioned, aside from two Garfield county farms, which, at the time of the trial, had returned some $2,000, was comparable in value to the stock in the Washoma Petroleum Company, and never returned plaintiffs anything substantial after they took it over.

The trial court's action in charging the jury that whether plaintiffs had been reimbursed was a question of fact was proper and, the jury having heard the evidence, there being sufficient evidence to sustain the jury's findings, we are of the opinion the jury was correctly instructed in this respect, and that the evidence supports the jury's findings.

Defendant sought to show that the market value of these different parcels of stock, at the time plaintiffs took them, was capable of being definitely ascertained. Then defendant advances to the proposition that, inasmuch as plaintiffs did not realize what defendant asserted was the reasonable market value thereof, they were negligent in the management of the different properties and by their own failure contributed to the inability of such property to reimburse them for the loss suffered. We are unable to consider the matter in this light, the evidence entirely failing to justify any such conclusion.

Defendant further complains of the giving of instruction No. 14, which was as follows:

"Evidence has been submitted tending to show that on or about October 20, 1930, these plaintiffs executed and delivered to the Farmers State Bank of Garber an instrument in writing, known as Defendant's Exhibit 1, and in which the plaintiffs therein and thereby released the Farmers State Bank of Garber from liability for its acts and conduct relative to the bonds involved in this action.

"In this connection you are advised that such release of the Farmers State Bank by the plaintiffs does not release this defendant from liability otherwise established."

Reference to this agreement in the record reveals that under the terms thereof the evident intention was solely to release the Farmers State Bank from liability, since it provided the stock and securities turned over to plaintiffs by Garber and Pulse was pledged to indemnify plaintiffs against losses suffered by reason of the mishandling and misappropriation of their bond account by the Farmers bank. Obviously this agreement was executed for the benefit of the plaintiffs and the Garber bank.

Moreover, contrary to defendant's contention that this property turned over to plaintiffs should have been credited at its reasonable market value, which it was asserted to have, and that the plaintiffs willfully and negligently mismanaged such property until it was lost or became valueless, the evidence presented to the jury failed to show negligence in the management. In fact, the evidence showed plaintiffs invested heavily of their own assets in an attempt to save what was of value, and a claim that they mismanaged the properties is unsound, in view of the fact that a large part of this property was heavily involved at the time they took

it over, and plaintiffs staved off foreclosure on portions of the property only by further investment.

Neither can defendant escape liability on the ground that the release given the Farmers bank is a bar to the prosecution of this claim against defendant. The release mentioned explicitly stated that it was for the release of the Garber bank. Not having intended to release the defendant, it is settled under the decisions of this court that the release was in no manner operative as to the defendant, under the principle that release of one joint tort-feasor does not effect a release of the other. See Bland v. Lawyer-Cuff Co., 72 Okla. 128, 178 P. 885; City of Wetumka v. Cromwell-Franklin Oil Co., 171 Okla. 565, 43 P. 2d 434; Safety Cab Co. v. Fair, 181 Okla. 264, 74 P. 2d 607; Adams v. Stanolind Oil & Gas Co., 187 Okla. 478, 103 P. 2d 526.

We have considered the other instructions not separately dealt with herein, and are of the opinion the instructions given by the trial court fairly presented the issues for the jury's determination.

In view of the discussion presented, we hold the evidence was sufficient upon which to base the judgment rendered, and the judgment as rendered was not excessive, but entirely supported by the evidence.

Judgment affirmed.

RILEY, OSBORN, GIBSON, and HURST, JJ., concur. WELCH, C. J., and BAYLESS and ARNOLD, JJ., dissent. DAVISON, J., dissents to affirmance for full amount of judgment.

———

RILEY, J. (specially concurring). Fraus est celare fraudem. I concur, not upon the law of bailment as expressed in the opinion of the Vice Chief Justice, but by reason of the law applicable to conspirators and embezzlers who defraud. The cause at bar involves the banks of Garber and Enid and plaintiffs. The defendants were joint tort-feasors, thus they were jointly and severally liable for the entire loss resulting from their unlawful enterprise.

The instructions given by the trial court were more favorable to defendant than required under the issues. These issues were sustained by uncontradicted proof.

But, under the law of bailment, when the Enid bank, as gratuitous bailee, defrauded the plaintiffs in one instance, it became liable for the sum total of all loss connected with the bailments which from time to time occurred under the general plan and scheme, of which bailments were a small part.

The record supports the view that the entire transaction by which the loss adjudged, occurred, resulting from a well-defined and coextensive plan and scheme. It does not matter which actor in the plan and scheme was the motivating spirit. The fact remains that the entire amount of value fixed by the judgment was embezzled, and being so, the joint acts were mala in se. Party defendants were in pari delicto and should be, as they were, jointly and severally liable for the whole loss resulting to the plaintiffs. Falsus in uno, falsus in omnibus.

WELCH, C. J. (dissenting). I agree that bonds in the total sum of $249,000 are shown either to have passed through, or to have been handled by the American National Bank of Enid, which the Crews heirs ultimately lost. But the verdict and judgment fixing liability on the Enid bank for each and all of them is excessive. The Enid bank was of course the gratuitous bailee of these bonds from the Garber bank, bailor, as shown by the majority opinion, but as shown by the majority opinion, five bonds of $10,000 each (total $50,000) were returned by bailee to bailor, the Garber bank. Two of these bonds ($20,000) were returned to Garber bank in 1924 and three ($30,000) were returned to Garber bank in 1925, and their loss by the Crews heirs resulted directly from the subsequent defalcation of their trustees, the Garber bank, selected by them and trusted by them. The Enid

bank had nothing to do with the final disposition of these bonds ($50,000) after returning them to the bailor, Garber bank, more than six years before this suit was filed, and five years or more before Mr. Taft died. I find no basis for fixing liability on the Enid bank for the loss of this $50,000. I agree with the majority of opinion that these five bonds were disposed of by the Garber bank or some one of its officers and the money embezzled, but the Enid bank did not do it nor aid in doing it. I cannot agree that the former holding of these bonds by the Enid bank made it liable. The Enid bank did formerly hold them. It held them as bailee, and returned them undamaged to its bailor several years before these plaintiffs made any demand or sought to enforce any liability against the Enid bank. See 6 C. J. 1150; 65 C. J. 35.

It should not be overlooked that the trustee, the Garber Bank, had the right to place these bonds in bailment and the Enid bank the right to so receive them. It was so held by the trial court without objection or exception by plaintiffs. It would seem to clearly follow that the Enid bank had the right to return them to the trustee and the trustee the right to receive them back. Then, as to these five bonds, the effect of the majority opinion is to hold that when the trustee, in violation of the trust, sold them and embezzled the proceeds, the owners may recover their value from the Enid bank because the Enid bank had theretofore held the bonds in bailment for a time and returned them when requested, to the trustee, who was the Enid bank's bailor. Of course no sustaining authority is cited.

The rule imposing liability on the Enid bank is stated in paragraph 5 of the syllabus. The majority opinion is not clear as to how it is concluded the Enid bank joined in or aided the embezzlement of the proceeds of these five bonds. It is my view that the act of the Enid bank in holding these bonds as bailee for a time did not damage plaintiffs at all and did not aid the trustee in its subsequent sale and embezzlement. It seems to me a strange rule of liability of a bailee that, as to property held by a trustee with authority to sell it or place it in bailment, if he first does the latter, the bailee who receives it and thereafter on request returns it intact to the trustee is himself liable to the owner if the owner's trustee subsequently sells the property and embezzles the proceeds.

I am mindful of the grievous wrong done plaintiffs, and of the great loss they sustained, but it resulted from their misplaced confidence in the trustee of their own selection. The courts should lend all possible aid to plaintiffs, but in measuring the liability of defendant, Enid bank, which handled these bonds as bailee of plaintiffs' trustee, we should be guided by the rules applicable to such bailment.

All these bond purchases and bond sales were handled in a number of separate transactions, each independent of the other. Neither item of bond purchase had any connection with any one before it or any one after it, nor did any bond sale have any connection with any sale after it or before it. The case was tried upon the theory that each such transaction was separate. This is disclosed by the record of evidence introduced by each party and by the court's instructions submitting the cause to the jury. In instruction No. 3 the court instructed the jury that each separate transmission of bonds to the Enid bank constituted a gratuitous bailment, and instruction No. 17 is quoted in full as follows:

"You are instructed that you must apply these instructions as a whole separately to each of the several transactions complained of in the plaintiffs' amended petition and shown in the evidence, and, so applying these instructions as a whole separately to each of such transactions, determine the liability or nonliability of the defendant to the plaintiffs in each of such transactions, and so, in such manner, make up and determine your final verdict."

The plaintiffs did not except to these instructions and make no point here on either of them being erroneous.

In this case there was no theory or evidence that defendant Enid bank was a coconspirator and acted pursuant to a general plan or scheme and therefore would be liable for the acts and defalcations of the Garber bank.

Furthermore, the majority opinion shows a number of the bonds, totaling nearly $100,000, were either collected at maturity or sold, and a return of the proceeds made to the Garber bank, all as directed by the Garber bank, and all several years before the death of Mr. Taft. The original escrow contract specifically authorized the Garber bank to resell bonds bought for the Crews heirs, or to collect them at maturity. The contract was so construed by the trial court without objection or exception. The Garber bank having the right to make those sales and collections, it could do so through the Enid bank, or through any bank, without making that bank liable for the subsequent embezzlement of the proceeds by the Garber bank or any of its officers. If these particular collections and sales had been made by or through a New York bank, or a Federal Reserve bank or the United States Treasury, the making of proper return of proceeds to the Garber bank would have left no liability remaining against these agencies in favor of the Crews heirs. In the same position is the Enid bank as to those of the bonds which it aided the Garber bank to sell and collect, as the Garber bank had the full authority to sell and collect. The contrary holding of the majority opinion is not supported by cited authority and to my mind is not itself convincing.

The fifth paragraph of the syllabus of the majority opinion would imply the Garber bank only "had apparent authority and control over the bonds." The fact is that the original contract of the plaintiffs, as is construed by the trial court without objection, gave the Garber bank actual and complete and unrestrained control over the bonds, as to when and whether they would be sold, and where they would be kept or held.

On page 7 the majority opinion refers to the first sale of bonds being the sale of bonds in the sum of $27,000 to Mr. M. C. Garber and Mrs. Lucy Garber. The statement in that paragraph implies that the Enid bank, holding these bonds for safekeeping, sold them and then advised the Garber bank thereof; all without any former authorization from the Garber bank to sell those bonds. The fact is the Enid bank was first authorized by the Garber bank to make that sale and after making it, the Enid bank did write Taft of the Garber bank that the sale was made and the amount was credited to the account of the Garber bank. If it is in the minds of the majority that the Enid bank, holding these bonds as bailee, breached their trust and disposed of the bonds without authority from the bailor, Garber bank, then the majority opinion should say so emphatically, but since that is not the fact and cannot therefore be used as a basis of liability, the majority opinion should not so imply. All of the bonds which were ever sold by the Enid bank were sold upon the express authority and direction of the Garber bank through its officials, and it is nowhere contended to the contrary.

These particular bonds were sold to Mr. M. C. Garber and Mrs. Lucy Garber before any one of the bonds had been mishandled in any manner. These bonds were sold and return made of the proceeds in December, 1922, and it is not contended that there was any technical mishandling of any bond until during the following calendar year. I do not see how the majority opinion does or can justify the approving of liability against the Enid bank for these bonds. It is true that subsequently the Garber bank or its officers embezzled these proceeds so that the Crews heirs suffered total loss, but such loss was not caused or contributed to by the Enid bank, nor could the Enid bank up to the time of this sale have possibly had knowledge of any wrongdoing or bond mishandling, because up to that time none had existed.

The trial court correctly instructed the jury as follows in instruction No. 10:

"You are instructed that the Farmers

State Bank of Garber, as trustee of the funds belonging to the plaintiffs and in the Crews Estate Oil & Gas Producers escrow account, had the right to deposit for safekeeping such United States Government Bonds and Treasury Certificates, purchased out of the proceeds of such fund, in the American National Bank, and that the defendant, American National Bank, had the right to receive and accept such bonds for safekeeping; and you are informed that if you find from the evidence submitted that the Farmers State Bank of Garber invested either in whole or in part the funds of the Crews Estate Oil & Gas Producers escrow account in United States Government Bonds and Treasury Certificates, and transferred such bonds and Treasury Certificates to the American National Bank for safekeeping and that the American National Bank received such United States Government Bonds and Treasury certificates for safekeeping upon behalf of said Farmers State Bank of Garber and thereafter returned to the Farmers State Bank of Garber the identical United States Government Bonds and Treasury Certificates or other United States Bonds and Treasury Certificates of like quality and value or the proceeds of the sale of such bonds and certificates equal to the then fair cash market value thereof, then and under such circumstances the American National Bank, the defendant herein, would not be liable to these plaintiffs by reason of such transactions."

The plaintiffs did not except to this instruction and did not here assert the same was in any manner erroneous or contend any incorrect statement of the law.

Each bond sale made by or through the defendant, Enid bank, was made at the then market value or price as shown by the record, and it is nowhere contended to the contrary.

The majority opinion repeatedly refers to the Enid bank's mishandling of bonds in the pledging of such bonds to secure deposit of public funds in the Enid bank. That use of the bonds, although by express permission of the Garber bank, was nevertheless a wrongful use. However, that wrongful use was only temporary and did not injure or damage the bonds, and that use did not damage these plaintiffs. When those bonds were released from such pledge they were all returned to the custody of the Enid bank and were thereafter handled by the Enid bank exactly as directed by the Garber bank. As to that item of temporary misuse, this case was tried on the theory that the same would not create liability of the Enid bank if said bonds in kind were returned to the Enid bank before the Crews heirs, plaintiffs, made claim thereof. The trial court specifically so instructed the jury in instruction No. 15. The plaintiffs did not except to that instruction, nor did they question the correctness of that legal rule in their briefs. The majority opinion is in error in relying upon this circumstance as fixing liability against the defendant (6 C. J. 1113-14), since the rule is so reasonable and so well settled that the temporary wrongful use of property by the bailee thereof imposes full liability for all damages caused by or flowing from such use, but in itself imposes no other or future liability or responsibility on the bailee.

Thus it is demonstrated from the majority opinion that the verdict and judgment is excessive by approximately $150,000; and when considered as fixing liability for each and every one of the bonds as it must be, is not sustained by evidence and is contrary to law. These are matters specifically assigned as error, and since they alone would justify reversal to the end that proper liability should be determined, I do not discuss other propositions presented.

I respectfully dissent to affirmance in full.