Allie Z. HOLMES, widow, T. C. Holmes, Ada Holmes Head, Luda Holmes Lovelace, now Hoffman, Irene Shortes, Woodrow Holmes, and James Lewis Holmes, Plaintiffs in Error,

v.

C. E. McKEY, A. L. Brewer, and William T. Vaughn, Defendants in Error.

No. 38486.

Supreme Court of Oklahoma.

Dec. 18, 1962.

Rehearing Denied June 18, 1963.

Second Rehearing Denied July 30, 1963.

Houston Bus Hill, Oklahoma City, and S. H. King, Harold Freeman, Pauls Valley, for plaintiffs in error.

Curtis & Blanton, Pauls Valley, for defendants in error, A. L. Brewer and William T. Vaughn.

C. H. Bowie, Pauls Valley, for defendant in error, C. E. McKey.

IRWIN, Justice.

All of the Plaintiffs in Error, except Allie Z. Holmes, are the children and heirs of L. A. Holmes who died May 26, 1947. Allie Z. Holmes is the surviving spouse of L. A. Holmes.

L. A. Holmes and Allie Z. Holmes, husband and wife, acquired title to a 140 acre farm in Garvin County, and began living on it around 1934. It is stipulated that they owned only 130/140ths or 130 acre mineral interest. Prior to the commencement of this action, the following deeds covering the 140 acre farm were of record.

(1) Deed from L. A. Holmes and Allie Z. Holmes in favor of John Main, dated November 20, 1946, and filed for record January 13, 1947. This deed reserved unto the grantors, L. A. Holmes and Allie Z. Holmes an undivided one-half interest in the minerals.

(2) Deed from John Main and Leora Main, husband and wife, in favor of C. E. McKey, dated January 11, 1947, and filed for record January 13, 1947. This deed excepted from the conveyance the undivided one-half interest reserved by L. A. Holmes and Allie Z. Holmes.

(3) Deed from C. E. McKey and his wife in favor of William T. Vaughn, dated February 7, 1947, and filed for record February 20, 1947. This deed conveyed an undivided one-third (⅓) interest in and to the 140 acre farm, except one-half (½) of the minerals reserved by L. A. Holmes and Allie Z. Holmes in their deed to John Main, dated November 20, 1946.

(4) Deed from C. E. McKey and his wife in favor of A. L. Brewer, dated February 7, 1947, and filed for record April 18, 1947. This deed conveyed an undivided one-third (⅓) interest in and to the 140 acre farm, except one-half (½) of the minerals reserved by L. A. Holmes and Allie Z. Holmes in their deed to John Main, dated November 20, 1946.

Under the above deeds record title to the 140 acre farm was as follows: L. A. Holmes and Allie Z. Holmes had an undivided 70/140ths interest in the minerals; C. E. McKey, William T. Vaughn and A. L. Brewer each had an undivided one-third interest in the surface and an undivided one-third interest in 60 acres of the minerals or a total of 60 mineral acres.

In November 1951, John Main and Leora Main commenced proceedings against defendants in error, C. E. McKey, William T. Vaughn and A. L. Brewer, for the purposes of establishing a constructive trust in their favor covering all the interests of record held by McKey, Vaughn, and Brewer. The basis for this action was that the deed from the Holmes to Main vested title in Main and that he and his wife were later defrauded of said property by being led to believe, when they executed the deed to McKey, that said instrument was merely a "release", rather than a conveyance; that the deed was obtained by fraudulent acts and deceitful statements and that said deed was wholly inoperative as a conveyance and of no legal force and effect.

After the above action was commenced and on December 5, 1951, there was placed of record a deed from L. A. Holmes and Allie Z. Holmes, dated January 15, 1947, conveying to defendant C. E. McKey the 140 acre farm except an undivided one-half interest in the minerals.

On October 8, 1952, plaintiffs in error filed a petition of intervention wherein they sought to set aside and cancel all the above described deeds heretofore mentioned and to quiet fee simple title in them. The allegations in the petition of intervention were that all the deeds were obtained by fraud and misrepresentations and were acquired jointly by the defendants and that said deeds conveyed no right, title, or interest in the 140 acre farm.

Before the cause came on for trial on any of the issues, the Mains dismissed their action with prejudice. Trial then was commenced before the court on the issues joined as between the intervenors and the defendants, McKey, Brewer, and Vaughn.

The trial court sustained the defendants' demurrer to intervenors' evidence and quieted defendants' title and after their motion for a new trial was overruled, intervenors perfected this appeal.

## FACTS

To understand the issues involved, it is necessary to set forth certain pertinent facts disclosed in the record.

L. A. Holmes and Allie Z. Holmes acquired the 140 acre farm and started living on it in 1934. The farm is located seven or eight miles southwest of Elmore City in Garvin County. Prior to the time they moved on the farm the Holmes' resided in the vicinity of Elmore City and had maintained a checking account and had done banking business at the First State Bank of Elmore City since 1911. Defendant A. L. Brewer is cashier and managing officer of the bank and had been cashier for forty years.

In 1942, Mr. and Mrs. Holmes rented the farm to a Mr. Blevins and moved to New Mexico. In 1943, they moved from New Mexico to California and placed the renting of the farm in the hands of Brewer, one of the defendants in error. Brewer, as rental agent of the Holmes, thereafter rented the farm to John R. Main and his wife, Leora, for an annual cash rental of $80.00. Each time Brewer collected the rent from Main he deposited it in Holmes checking account at the bank and mailed Holmes a copy of the deposit slip for said payment.

In October, 1946, the Holmes returned to Oklahoma to visit their son, T. C. Holmes, who was living near Pauls Valley, Oklahoma, and other relatives and acquaintances. While the Holmes were visiting on their farm, L. A. Holmes and John Main discussed a sale of the farm for $2,000.00, with Holmes reserving an undivided one-half interest in the minerals. Holmes told Main that if he decided to sell the farm, he would place a deed to convey the farm to Main in the hands of Brewer. If Main were able to raise the $2,000.00, he could pay said amount and get the deed from Brewer.

T. C. Holmes testified that he was with his father, L. A. Holmes, when Mr. Holmes discussed the sale of the land with Brewer. He testified that Mr. Holmes asked Brewer about the oil activity around the farm and that Brewer stated, " * * * it's deader'n

a mackeral" and that it would be "a darned good deal" to sell the farm for $2,000.00, with only one-half of the minerals, and that "I'd (Brewer) advise you to sell it" ; that Holmes said if he decided to sell the property that he would send Brewer the deed and " * * * Mr. Main, if he comes up with the $2,000.00, you will know how to fix it", and Mr. Brewer said he did.

T. C. Holmes further testified that Brewer asked Holmes how much time John Main would have and L. A. Holmes stated "thirty days", and that Mr. Brewer said, "What do you want me to do in case he doesn't (get the money) ? " and his father answered, "Return the deed back to me".

At that time Sohio Oil Company had been engaged in drilling the Sohio-Howard No. 1 well located two and one half miles from the Holmes farm, for approximately one year. The well was referred to as a "tight hole" and had created no activity at that time.

L. A. Holmes suffered a heart attack on his return to California and did not reach his California home until the middle of November, 1946.

On November 20, 1946, Holmes and his wife wrote a letter to the First State Bank of Elmore City and enclosed a deed to the farm. The deed was in favor of John Main, dated November 20, 1946, and conveyed the surface and reserved one-half of the minerals in the grantors. The letter contained the following:

> "Enclosed find deed from L. A. Holmes and wife to John Main, a married man conveying 140 acres in Garvin County. Kindly deliver said deed to John Main when you can collect for our account the sum of $2,000.00. When you have collected said $2,000.00 kindly deposit the same to our account and send us a duplicate deposit slip. Any expenses incurred hereby will be born by John Main. Thanking you in advance, we remain
> Encl.
> P.S. Kindly notify us if this matter is not taken care of in 30 days."

There is a presumption that the letter and deed were received in due course of the mails after it was mailed on November 20, 1946, and defendants state in their brief that "we can assume that said deed was received by the bank some three or four days later". In this connection see 31 C.J.S. Evidence § 136d; and Keeling v. Travelers Insurance Co., 180 Okl. 99, 67 P.2d 944. Therefore, soon after November 20, 1946, Brewer came into possession of the deed from L. A. Holmes and Allie Z. Holmes in favor of John Main.

There is no evidence in the record whatsoever that Brewer ever notified Holmes that the matter was not taken care of.

The testimony of John Main, submitted by deposition, was that he went to the bank prior to November 20, 1946, and three or four times after that and inquired of Brewer if the deed was there, and that Brewer advised him that he didn't know anything about the deed. The testimony also discloses that Main received a letter from Holmes the last of November or the first of December, 1946, advising him the deed to the farm had been sent to the bank and the deal was ready to be closed and that one of the trips to the bank by Main was made after the receipt of the letter from Holmes, and Brewer still advised him that he didn't know anything about the deed. In giving such statements, Main was not certain as to the exact time when he asked Brewer about the deed, i. e., whether it was before or after Brewer received the Holmes-Main deed.

In December, 1946, the Sohio well began to get favorable "showings" of oil on drill stem tests. Although the well was being drilled as a "tight hole" the results of these tests became somewhat known in the vicinity and generally among lease brokers, and there was considerable activity in leasing and the sale of minerals. Rineharts Oil Reports dated January 3, 1947, reported the Sohio well as "drill stem test flowed oil and gas; 7–5/8″ 8256′; cored 10,542–45′ for sand with good stain, Drilling 10,666′, (tight hole)."

On January 2, 1947, defendant McKey went to the home of T. C. Holmes, son of L. A. Holmes, and asked if his parents could be reached by telephone in California. McKey told T. C. Holmes that he intended to go to California and wanted to visit Mr. Holmes while he was there.

On January 2, 1947, the following letter from Holmes was mailed to the bank:

"January 2, 1947
"Just a few lines in regard our place Mr main never got the money and the time is out and Charley McKey call this morning and sed he wanted it and you can make the deads over to him and be sure to make thim out For half roualty and sent the papers to us. i will close.

L. A. Holmes"

In A. L. Brewer's deposition, which was admitted in evidence as admissions or statements against interest, he stated that the first conversation that he had with McKey regarding the land was after McKey told him that he had bought it from Holmes and that he prepared the deed from Holmes to McKey at that time; that he could not recall whether it was agreed that he was getting an interest in the property at that immediate time but soon thereafter.

Mr. Brewer was further asked.

"Question: What was Mr. McKey to pay for the property?

"Answer: Two Thousand Dollars.

"Question: And when was you to get your interest in it, as soon as the deed comes back?

"Answer: Well now I can't answer positively when, I don't recall whether it was that time that we discussed it, however, after he worked out the deal and got it—in fact of the business, at that time no one individual—we three were not in a position to invest two thousand dollars in the property of that kind.

"Question: What were you supposed to have paid for it?

"Answer: I was to pay one-third of the cost of it."

Mr. Brewer prepared the deed from Holmes to McKey and mailed it to Holmes in California. The following letter was then received by Mr. Brewer from Holmes:

"Jan. 8, 1947

"Mr. Lee Brewer

"I have received the new Deed but dident understand why their were only one copy.

"As you know I want a paper made & sign by a notary showing I have one half undivided oil rights so will you fix such a paper and send it with the Deposit slip for the $2,000.00 as he has the other Deed, and I have a paper to keep showing my rights, and I then sign and send the new Deed back to you.

"And one thing I payed for the other Deed and I feel now that Charley must pay for this new Deed so will expect a reply with paper soon.

"Your Truly,
"L. A. Holmes
"Salinas, California
"East Salinas, Branch."

The deposition of Mr. Brewer further discloses that he and McKey discussed what arrangements would be made with John Main. He stated " * * * in the conversation it was discussed that John be paid something for his trouble in the matter since he was trying to sell it" and that "it was agreed to pay him a hundred dollars and one year's rent on the place". Brewer stated that he still had the Holmes-Main deed in his possession when he obtained the Main-McKey deed on January 11, 1947, and that he paid Main the $100.00, or credited Main's account for $100.00, and that he was given credit for the $100.00 in their final settlement.

Brewer and McKey both stated that Brewer was acting as the agent of McKey in the McKey-Main transaction. However, the record shows that prior to January 11, 1947, Brewer and McKey had agreed that Brewer would receive an undivided one-

third interest in the property. Therefore, Brewer was not only acting for McKey, he was also acting for himself when he secured the Main-McKey deed.

On January 11, 1947, the same date Brewer secured the Main-McKey deed from Main the following letter was written to Holmes by Brewer:

"Dear Mr. Holmes:

"I am enclosing copy of deed, certified by me to be a copy of deed to Charlie, I will personally see that only one half of the oil, gas and minerals go to Charlie. I am enclosing the copy and $3.00 to pay the notary fee.

"I will appreciate you sending deed as soon as convenient, I am also enclosing deposit fee for $2,000.00.

Best of luck,
Yours very truly,
A. L. Brewer"

The bank statement of L. A. Holmes discloses a deposit to his account on January 13, 1947 in the sum of $2,000.00; the bank statement of C. E. McKey discloses a withdrawal of $2,000.00 on January 13, 1947.

On January 15, 1947, L. A. Holmes and Allie Z. Holmes mailed the Holmes-McKey deed to Brewer.

In addition to the Rineharts Report, dated January 3, 1947, listing the Sohio Well as heretofore set out, there appeared in the local papers during the latter part of January that the same was a big producer and had opened a major oil play for the Garvin County area.

The evidence discloses that Brewer, McKey and Vaughn each paid an undivided one-third of the total costs of the farm and that McKey conveyed by separate deeds to both Brewer and Vaughn an undivided one-third interest on February 7, 1947.

PLEADINGS

Intervenors' petition in intervention and amended petition alleged, inter alia, and in addition to some of the facts herein before stated, that defendants, Brewer, McKey and Vaughn, as secret partners and joint ven-

turers, had conspired to divest L. A. and Allie Z. Holmes of the subject farm interest by fraud and deception, at a small fraction of its true value, and at a time when said conspirators knew that, by reason of the developments in, and transactions on all sides of the Sohio-Howard No. 1 Well, of which the Holmes had no knowledge, said property had a mineral value much greater than the $2,000.00 paid for it. The petition contained allegations contemplated to charge that the banker, Brewer, was the business advisor and counselor, general agent, and/or fiduciary of the Holmes with reference to the farm in question, or its sale, and that it was in reliance upon his advice that they had decided to sell it to Main for the named consideration. They prayed for cancellation of the deed from the Holmes to Main on the ground that it was nullity and conveyed no title, because its delivery was unauthorized under the terms of the hereinbefore decribed escrow arrangement; and, that it was never delivered to, nor accepted by Main. They also prayed for cancellation of the hereinbefore described warranty deed from the Mains to McKey on the ground that it was executed and delivered for a wholly inadequate consideration, and under said grantors' misapprehension, produced by Brewer's misrepresentation, that it was merely a "release", rather than a purported conveyance of title. The petition also referred to the warranty deed which the Holmes had executed and delivered to McKey as "fraudulently procured" and a nullity; and prayed that it be cancelled also. Intervenors further alleged that, by reason of the fraud referred to, the defendants took, and held, the subject property "in trust" for them. Besides praying for the quieting of title to the real estate in them, the intervenors also prayed for a money judgment against defendants for all lease and rental monies and any other income that they had derived therefrom, less the $2,000.00 paid L. A. and Allie Z. Holmes for said property, as aforesaid.

## CONCLUSIONS

We will first consider the relationship of Holmes and Brewer in connection with the proposed sale of the farm by Holmes to Main.

■ From the evidence adduced we can only conclude that when the Holmes-Main deed was received that such constituted an escrow arrangement and/or principal-agent relationship. We further conclude that since Brewer had been Holmes rental agent for renting the farm to Main and Holmes had discussed leaving the deed with Brewer with both Main and Brewer, and Holmes discussed with Brewer the advisability of selling the farm for $2,000.00 and how the transaction could be handled if Holmes decided to sell the farm, and from the correspondence, that Brewer, and not the bank was the escrow agent or agent of Holmes in the Holmes-Main transaction.

It was after Brewer received the deed from Holmes that Main testified that he inquired of Brewer if he had the deed and that Brewer stated that he did not know anything about the deed. The evidence is. not clear as to whether Brewer had the deed when Main made his inquiry to Brewer. Although T. C. Holmes testified that Main was to have thirty days within which to pay the purchase price and receive the deed, the letter of transmittal enclosing the Holmes-Main deed placed no time limit. The only time mentioned was "Kindly notify if this matter is not taken care of in 30 days".

Brewer did not notify Holmes that the matter was "not taken care of" nor did he return the deed to Holmes. After Brewer received the letter from Holmes dated January 2, 1947, advising him that "the time had run out on Main" Brewer was without authority to deliver the Holmes-Main deed to Main. Whether he could have delivered it to Main prior to receipt of the January 2, 1947 letter, or after thirty days of its receipt, is immaterial, as no delivery was made. However, Brewer continued to be the agent of Holmes as he retained the Holmes-Main deed and kept possession of the same until it was placed of record on January 13, 1947.

We will now consider the relationship between Holmes and Brewer after Brewer

received Holmes letter of January 2, 1947, and also the relationship of Brewer and McKey.

Although Brewer's duties and obligations as an agent of Holmes in the Holmes-Main transaction may have terminated upon receipt of the January 2, 1947 letter from Holmes, his duties and obligations as agent for Holmes continued as he still retained the Holmes-Main deed and he became the agent of Holmes in the Holmes-McKey transaction. This is substantiated by the fact that the only dealings or negotiations that McKey had with Holmes was the telephone conversation with Holmes on January 2, 1947. The record discloses that it was during the time that Brewer was the agent of Holmes, and prior to the time of the delivery of any deeds to any grantees, that it was agreed that Brewer, McKey and another person would purchase the property together and each would pay his proportionate share of the costs. The record further shows that during such time McKey did not have an enforceable contract for the sale of the property against Holmes as he had paid no consideration for the purchase of the property in his oral agreement with Holmes

After it was agreed that Brewer, McKey and another person would purchase the property together, and in furtherance of the proposed purchase, Brewer went to the home of Main and obtained from Mr. and Mrs. Main the Main-McKey deed and credited Main's note for $100.00 and gave Main one years rent on the farm. The record shows that the Holmes-Main deed was not delivered to Main, or that he knew that it was or to be delivered, or that he consented to its delivery or to its filing. The record also discloses that when the Main-McKey deed was executed and filed for record, Main had no interest in the property nor has he subsequently acquired an interest; that Brewer and McKey both knew he had no interest and Holmes did not know that Main had executed the deed.

It is apparent that Brewer and McKey did not want to wait on the Holmes-McKey

transaction to be completed before acquiring record title to the surface of the farm and an undivided 60 acres in the minerals, but wanted the records to show their interest prior to such time as they filed or caused to be filed the Holmes-Main deed and the Main-McKey deed on Monday, January 13, 1947.

The record also shows that Brewer never did inform Holmes that he was purchasing an interest in the property; that the oil activity in the area was no longer "deader'n a mackeral" or that $2,000.00 would no longer be a good price for the property; that he would be or had been instrumental in obtaining the Main-McKey deed or that the Holmes-Main deed would be placed of record. The record discloses that prior to the time that the Main-McKey deed was obtained and filed for record, and the Holmes-Main deed was obtained and filed for record and the Holmes-McKey deed was executed that Brewer mailed at least two letters to Holmes.

On January 13, 1947, the Holmes-Main deed was filed for record and on the same date, Brewer either filed, or caused to be filed the Main-McKey deed. It is interesting to note that the Main-McKey deed was mailed to Brewer on January 15, 1947, but was not filed for record until this action was commenced and the deeds from McKey to Brewer and Vaughn, each dated February 7, 1947, referred to the Holmes reservation in the Holmes-Main deed and not the exception or reservation in the Holmes-McKey deed, even though Brewer and/or McKey had in his and/or their possession the Holmes-McKey deed.

We will first determine whether the trial court erred in sustaining the demurrer to the evidence as to defendant Brewer. In considering this question we should be cognizant of certain salient facts which the record shows: (1) Brewer told Holmes that the oil activity in the area was "deader'n a mackeral" in October, 1946, and that he would advise Holmes to sell the property for $2,000.00, (2) Brewer was the agent of Holmes in the Holmes-Main transaction,

(3) Brewer continued to act as agent for Holmes in the Holmes-McKey transaction, (4) Brewer did not advise Holmes during such agency that the oil activity in the area was no longer "deader'n a mackeral" and that favorable tests of the Sohio Well in the later part of December had greatly increased the price of minerals in the area, (5) Brewer acquired or agreed to acquire his interest in the property while he was the agent of Holmes without the knowledge or consent of Holmes, (6) Brewer was instrumental in getting record title to the property in McKey prior to the completion of the Holmes-McKey transaction.

In 3 C.J.S. Agency § 144, it is stated:

"In accordance with principles of utmost loyalty and good faith, an agent authorized to sell or lease his principal's property must in so doing act solely for his principal's interests; and, since there will exist an inducement to act adversely to his principal's interest if the agent is involved as purchaser or lessee while making the sale or lease, such an agent must, as a general rule, sell or lease only to a third person and must not, without the full knowledge or consent of his principal, himself become the purchaser or lessee either directly or through the agency of a third person. *Accordingly, without his principal's knowledge and consent, he must not become a partner or otherwise jointly interested in purchasing the property.*" (Emphasis supplied)

At pg. 208, § 257, 2 Am.Jur. "Agency", this is said:

"The general principal which denies the agent the right without knowledge and consent of the principal, to become the purchaser of property which he is employed to sell for the principal is aimed at an indirect or collusive sale or transfer, as well as a direct sale or transfer to the agent. * * *"

Where an agent purchases in violation of his fiduciary duties as an agent, the principal may elect to rescind the sale. At p. 22 of the above cited volume of C.J.S., this is said:

"In the absence of a consent to the agent's becoming a purchaser following full knowledge of all the facts, or a subsequent ratification of the transaction, the principal may elect to have the sale set aside and the property returned or reconveyed to him; * * *."

This rule is announced in W. R. Pickering Lumber Co. v. Sherritt, 105 Okl. 52, 233 P. 179, 180:

"We think the rule is that a contract made by an agent or broker whereby the agent or broker, without the knowledge or consent of a purchaser, receives commission from the party dealing with a purchaser, or in any manner acquires an individual interest in the subject-matter of the agency, is contrary to public policy and void. Cobb v. Wm. Kenefick [Co.], 23 Okl. 440, 100 P. 545; Levy v. Gross, 46 Okl. 626, 149 P. 237; Peaden v. Marler, 78 Okl. 200, 189 P. 741; Goldrick v. Roxana Petroleum Co., 74 Okl. 55, 176 P. 932. The foregoing decisions are of course based on the familiar principle that no man can serve two masters."

Assuming that Brewer's agency as to the sale of the farm to McKey, Vaughn and himself was limited to that of acting solely as an escrow agent, he, nevertheless, acted in said capacity as agent for the Holmes. See Creeden v. North, 160 Okl. 90, 15 P.2d 991. In Progressive Iron Works Realty Corp. v. Eastern Milling Co., 155 Me. 16, 150 A.2d 760, 762, it was said that "There is a fiduciary relationship created by and inherent in the nature of an escrow agreement", and in Collins v. Heitman, 225 Ark. 666, 284 S.W.2d 628, 633, this was said:

"The cardinal principle of all agency is good faith. In accepting the office of depositary, appellant became the agent of both buyer and seller. This created a relation of confidence the depositary could not thereafter violate nor pervert to his own advantage or the detriment of either principal. * * *"

In French v. Orange County Inv. Corp. et al., 125 Cal.App. 587, 13 P.2d 1046, it is pointed out that an escrow agent owes the utmost good faith to his principal and will not be permitted to profit personally from his agency.

We therefore hold that where a principal-agent relationship is created for the sale of property or to complete the sale of property, wherein an unenforceable agreement to sell is involved, the agent may not become a partner or otherwise jointly interested in purchasing the property while the principal-agent relationship exists without the knowledge or consent of the principal or a subsequent ratification of the transaction by the principal; and if an agent does become a partner or otherwise jointly interested in purchasing the property while such principal-agent relationship exists, without the knowledge or consent or subsequent ratification of the transaction by the principal, the principal may elect to have the interest purchased or acquired by the agent set aside and the property returned to him where the agent still owns the property so purchased.

Applying the above rule to the facts presented in the instant case, we hold the trial court erred in sustaining the demurrer to intervenors' evidence as to the defendant Brewer.

We will now consider the trial court's action in sustaining the demurrer to the evidence as to McKey.

The basis for intervenors' action against McKey is that he fraudulently conspired with defendants Brewer and Vaughn to divest Holmes of the farm.

In Democrat Printing Co. v. Johnson, 71 Okl. 128, 175 P. 737, we held:

"It is not necessary, in an action on the case in the nature of a conspiracy, to prove by direct evidence that the parties actually came together and entered into a formal agreement to do the things complained of; but such an understanding may be shown by proof of facts and circumstances from which the existence of a conspiracy may be inferred, * * *".

"When a conspiracy is entered into to cheat and defraud any person of any property, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their co-conspirators until the object for which the conspiracy was entered into is fully accomplished."

Since all of the correspondence with Holmes and the transactions with Main were conducted by Brewer, except McKey's telephone conversation with Holmes on January 2, 1947, agreeing to purchase the farm, we should be mindful of 3 Am.Jur.2d "Agency", § 18, which states:

"While the creation of an agency relationship, so far as the principal and agent are concerned, arises from their consent, it is not essential that any actual contract exist or that compensation be expected by the agent or agreed to by the parties. While the relation, in its full sense, arises out of a contractual or gratuitous agreement between the parties, yet the agency and the assent of the parties thereto may be either express or implied."

"An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties. * * *"

In Berry v. Stevens, 168 Okl. 124, 3 P.2d 950, we held:

"One who accepts the benefits of an act done by one assuming to be his agent thereby ratifies his act and takes it as his own, with all its burdens as well as its benefits."

"Confidential relation exists between parties to a transaction wherein one of the parties is in duty bound to act with

the utmost good faith for the benefit of the other party, and includes legal and all other relationships where confidence is rightfully reposed. The gist of a fraudulent misrepresentation is the producing of a false impression on the mind of the other party, and, if this result is actually accomplished, the means of accomplishing it are immaterial."

In the above case plaintiff sought to set aside a conveyance on the ground of fraud. Plaintiff had written to one of the defendants, one Stevens, and offered to sell the property for a stated consideration. Subsequent thereto, Stevens went to the plaintiff and plaintiff inquired as to the oil development. Although plaintiff knew there was oil development, he was not aware of a new large oil well which had come in. Stevens mentioned the usual production but did not mention the new well which had come in.

The trial court overruled the demurrer to the evidence as to Stevens and sustained the demurrers of his two co-defendants, who jointly purchased the property with Stevens. On appeal this court reversed the judgment on the ground that the co-defendants accepted the benefits of their agent and co-purchaser and were charged with the fraud of Stevens for failure to divulge information concerning the new and large oil well.

It follows that if Brewer and McKey fraudulently conspired to divest Holmes of the property; or if Brewer was the agent of McKey, whether such agency was express or implied, in the Holmes-McKey transaction, that McKey's interest in the farm is subject to the acts of Brewer, as well as being subject to his own fraudulent acts.

In considering the fraudulent conduct we should be cognizant of our decision in the case of Griffith v. Scott, 128 Okl. 125, 261 P. 371, wherein we said:

" 'Fraud may be proved by circumstantial evidence. Indeed, from its nature it is difficult to prove it by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way. It is impossible, however, to enumerate the facts from which it may be inferred. Each case must depend on its own facts, and all the facts and circumstances connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent. Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others make a strong case.' "

We have heretofore held that the evidence adduced discloses that Brewer was the agent of Holmes in the Holmes-McKey transaction and that during such agency, Brewer and McKey agreed that they and another person would purchase the property together. McKey knew that Brewer was Holmes agent and that Brewer had in his possession the Holmes-Main deed. McKey also knew that the oral agreement he made with Holmes was unenforceable and that his transaction with Holmes would have to be completed through Brewer.

Brewer and McKey both stated that Brewer was acting as McKey's agent when Brewer obtained the Main-McKey deed. In addition to acting as agent for McKey, Brewer was also acting for himself for the evidence discloses that prior to obtaining the Main-McKey deed, Brewer, McKey and another person had agreed to share equally in the purchase price and the interests purchased.

Prior to the time that McKey had an enforceable contract against Holmes, the oil activity was no longer "deader'n a mackeral". Brewer knew, or had reason to know that Holmes did not know that there had been any appreciable change in the oil

activity and that it was probably the same as it had been in October, 1947, when he first discussed the advisability of selling the property to Main and Brewer advised him to sell the property. Brewer did not divulge this information to his principal, Holmes, but without the knowledge and consent of Holmes, acquired, or agreed to acquire an interest in the property, and proceeded to get the deed from Main, even though Main had no interest in the property, and caused to be filed the Holmes-Main deed and the Main-McKey deed for record.

In Smiley v. Jaggers, Okl., 327 P.2d 652, we held:

"In a case of equitable cognizance, where the defendant demurred to the plaintiff's evidence and the trial court, after weighing the evidence as on a motion for judgment in favor of the defendant, rendered judgment in favor of the defendant, such judgment of the trial court will not be reversed by this court upon appeal unless said judgment is against the clear weight of the evidence."

In Berry v. Stevens, supra, we stated in substance the above rule and said:

"This doctrine is so well established in this jurisdiction that it requires no discussion; but this court has always reserved the right and acknowledged the duty to set aside the findings of a trial court when it appears from the record that the conclusions reached by the trial court are clearly against the weight of the evidence; * * *."

In the instant action, the trial court did not state specifically why it sustained the demurrers of the defendants. It may have based its conclusion on the statute of limitations, which was alleged by defendants; or it may have determined that Brewer was not the agent of Holmes or McKey; or that there were no fraudulent acts committed against Holmes.

By the clear weight of the evidence adduced, Brewer was not only the agent of Holmes, but he was also the agent of Mc-Key in completing the sale of the property to McKey, himself and a third person, and Brewer withheld information from Holmes, which as an agent of Holmes, he was legally and morally obligated to give Holmes.

Therefore, the interest held by McKey is subject to and burdened by the acts and deeds of Brewer while he was the agent of Holmes. We conclude and hold that the trial court erred in sustaining the demurrer to the evidence as to McKey.

The interest held by the defendant Vaughn is subject to the same burden as in the interest of defendant McKey. The record discloses that three persons (Brewer, McKey and another) agreed to purchase the property together and that each would pay a one-third of the total cost.

On February 7, 1947, the same day that C. E. McKey executed the deed to Brewer conveying to Brewer an undivided one-third interest in the property, he executed the deed to Vaughn conveying to him an undivided one-third interest. Both of these deeds were acknowledged by the same notary and each referred to the mineral exception and reservation in the Holmes-McKey deed. The record also discloses that Brewer, McKey and Vaughn each paid one-third of the total purchase price which included the $100.00 payment to Main. Brewer's check to McKey was for $601.55 (Brewer had already paid $100.00 to Main) and Vaughn's check was for $701.55.

Considering all the transactions and surrounding facts and circumstances, we can only conclude that by the clear weight of the evidence Vaughn was the "other" person referred to with reference to the three people purchasing the property together. Since Vaughn's interest could have been acquired only through the acts and conduct of Brewer and McKey, who were acting for and on behalf of all three defendant purchasers, such interest is subject to the acts and conduct of defendants Brewer and McKey. We therefore hold that the trial court erred in sustaining the demurrer to the evidence as to defendant Vaughn.

We will now consider defendants' contention that the cause of action was barred by the statute of limitations. In considering this contention we should be mindful that the fraud involved was the fraud perpetrated by Brewer, while he was the agent of Holmes, in agreeing to purchase and acquire an interest in the farm while he was such agent, and failing to divulge such information to Holmes and failing to advise Holmes of the material circumstances and facts existing as to value of the farm. The deed from McKey to Brewer was not filed for record until April 18, 1947, and it was dated February 7, 1947. There was nothing of record which would indicate or give notice that Brewer had purchased or agreed to acquire his interest in the property during the time that he was the agent of Holmes or that Brewer was also representing and acting as agent of McKey in completing the transaction between Holmes and McKey.

In American National Bank of Enid v. Crews, 191 Okl. 53, 126 P.2d 733, we held:

"In cases of fraud the statute of limitations begins to run only from the time of discovery of the fraud, or from such time as the defrauded party, by the exercise of ordinary diligence, might have discovered such fraud.

"The question as to when fraud is discovered, or with reasonable diligence could have been discovered, under the provisions of subdivision 3, Section 101, O.S.1931, 12 O.S.A. § 95, is one of fact to be determined from surrounding circumstances, relationship of the parties, and all facts of each particular case."

In reviewing the evidence submitted in the instant action, the clear weight of the evidence discloses that intervenors had no knowledge that fraud had been committed in divesting Holmes of the property and by the exercise of ordinary diligence, the same could not have been discovered, until after the Main suit was filed in November, 1951. Intervenors' petition in intervention was filed in October, 1952, and would not be barred by limitations.

The order of the trial court overruling Intervenors' motion for a new trial is reversed and remanded with directions that the trial court vacate its order overruling motion for a new trial and the judgment and order sustaining the demurrers to the evidence and grant Intervenors a new trial.

Judgment reversed.

WELCH, DAVISON and JOHNSON, JJ., concur.

JACKSON, J., concurs specially.

BERRY, J., concurs as to defendant Brewer; dissents as to defendants McKey and Vaughn.

BLACKBIRD, V. C. J., HALLEY, J., and LUTTRELL, Special Judge, dissent.

JACKSON, Justice (concurring specially).

I concur in the majority opinion for the reason that public policy will not permit an escrow depositary to avail himself of any advantage that his position may give him to profit beyond the agreed compensation, if any, for his services.

In 19 Am.Jur., Escrow, § 13, at page 430, it is said that in a broad sense an escrow depositary is the agent of both parties, but that strictly speaking he is not an agent but rather the trustee of an express trust with duties to perform for each of the parties. He is not empowered to aid either of the parties.

In 30 C.J.S. Escrows § 8, at page 1206, it is said:

"He (the depositary) is also liable for negligence in caring for the property deposited with him, or for breach of duty of good faith toward the depositor in personally acquiring such property at an inadequate price, * * *" (citing French v. Orange County Inv. Corporation, 13 P.2d 1046, infra).

In the cited case (French v. Orange County Inv. Corporation) it is said:

"We are convinced that the bank, as depositary of the deed here involved, owes to the grantors the utmost good faith, and cannot exercise the power conferred by its position as holder to use the paper for its own benefit or to the advantage of its president for an entirely different object to that for which it obtained it. * * *"

In the ninth paragraph of the editorial syllabus therein it is said:

"President of bank with which landowners deposited deed owed utmost good faith to landowners, and could not be allowed to profit personally."

In McHaney v. McHaney et al., 209 Ark. 337, 190 S.W.2d 450, 162 A.L.R. 1175, it was said:

"The rule governing the relationship of appellant and appellees is stated in the case of Walthour v. Pratt, 173 Ark. 617, 292 S.W. 1017, 1020, as follows: " 'Everyone, whether designated agent, trustee, servant or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule. of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his services. He may not speculate for his gain in the subject-matter of the employment. He may not use any information that he may have acquired by reason of his employment, either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interest.' 21 R.C.L. 825."

The foregoing statement was quoted with approval in an escrow depositary case in Collins v. Heitman, 225 Ark. 666, 284 S.W. 2d 628, and is cited in the majority opinion.

I am of the opinion that there is sufficient evidence to submit the case to a jury on the question of whether Mr. Brewer violated his duties as an escrow depositary and has become liable for any dereliction thereof. It is for this reason that I have quoted from the above mentioned cases in order to isolate and give greater emphasis to this proposition than is given by the majority opinion.