1998 OK CIV APP 133

**OKLAHOMA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, Plaintiff/Appellee,**

v.

**CLASSIC FIRE AND MARINE INSURANCE COMPANY, an Indiana Insurer, formerly known as First Horizon Insurance Company, a Minnesota corporation; Napoleon Services, Inc., a Delaware corporation, Defendants/Appellants.**

No. 88937.

Court of Civil Appeals of Oklahoma, Division No. 3.

May 5, 1998.

Certiorari Denied July 8, 1998.

Randy D. Witzke, Steven E. Bracklein, Oklahoma City, and David Steed, J. Darin Hayes, Wichita, KS, for Defendants/Appellants.

Stephen G. Solomon, John W. Rowntree, Jr., George W. Velotta II, Gary L. Levine, Oklahoma City, for Plaintiff/Appellee.

## MEMORANDUM OPINION

HANSEN, Judge:

¶1 Appellants, Classic Fire and Marine Insurance Company (Classic) and Napoleon Services, Inc. (Napoleon)(collectively Appellants), seek review of the trial court's judgment, granted on a jury verdict, in favor of Oklahoma Property and Casualty Insurance Guaranty Association (Guaranty Association). Classic was added as a party defendant during the pendency of this action when it became the successor to First Horizon Insurance Company (First Horizon), initially named as defendant.

¶2 From mid–1984 until early 1987, First Horizon participated in an insurance program in Oklahoma with Great Global Assurance Company (Great Global). American Excess Underwriters (AMEX) was the managing general agent for the program. First Horizon was domiciled in Minnesota. Great Global was and is domiciled in Arizona. AMEX's principal place of business was in Louisiana.

¶3 Great Global was licensed to sell workers' compensation insurance in Okla-

homa. First Horizon was licensed to sell liability insurance, but not workers' compensation. AMEX issued insurance packages containing a Great Global workers' compensation policy and a First Horizon automobile and general liability policy. Under what is commonly known in the insurance industry as a "fronting" arrangement, First Horizon agreed to accept 100% of Great Global's risk of loss under the workers' compensation coverage. As the policy issuing company, Great Global received 5% of the workers' compensation premiums as a "fronting fee". Great Global's workers' compensation policies contained an endorsement providing they were subject to the provisions of First Horizon's accompanying liability policy, particularly those pertaining to premiums due or losses paid.

¶ 4 Both AMEX and Great Global became insolvent. First Horizon's parent company formed Napoleon to, *inter alia*, take over AMEX's responsibilities in administering the Oklahoma insurance packages. There was no corporate relationship between AMEX and First Horizon, but First Horizon, having security interests in AMEX's assets, placed Napoleon in AMEX's business quarters and retained some of AMEX's officers and staff.

¶ 5 In February 1986, Great Global went into receivership in Arizona. In January 1987, the Oklahoma Insurance Commissioner was appointed as Oklahoma receiver by court order, and was directed to liquidate Great Global's Oklahoma claims by presentment to Guaranty Association. Guaranty Association began paying the workers' compensation claims in February 1987.

¶ 6 In October 1987, Guaranty Association received a letter from the Arizona receiver which called into question Great Global's liability on the workers' compensation claims. Guaranty Association began an investigation into the Great Global–First Horizon relationship, but decided to continue paying claims because of the court order and to avoid hardship on claimants. At the time of trial, Guaranty Association's claims payments, expenses and reserves for future claims exceeded $1,200,000.00.

¶ 7 In May 1988, Guaranty Association made demand by letter upon AMEX, Napoleon and First Horizon to determine which of them was responsible for the Great Global workers' compensation claims and to assume the defense, investigation and settlement of the claims. Guaranty Association also demanded indemnification of all sums "now expended and expended in the future." When Guaranty Association's demands were not met, it filed this action.

¶ 8 The case went to trial on a number of theories of recovery. Appellants also presented a number of defenses, primary of which was that the Great Global–First Horizon arrangement was one of reinsurance. The premise of Appellants' reinsurance defense was that pursuant to the uniform law on liquidating insurers, First Horizon's obligation or duty as a reinsurer, under *any* theory of claim, would be only to the Arizona receiver, not Guaranty Association.

¶ 9 At the conclusion of the evidence, the trial court ruled as a matter of law there was no reinsurance agreement. The jury entered general verdicts against First Horizon and Napoleon in the amounts of $577,117.95 and $687,292.66, respectively. This appeal is brought from judgment on those verdicts.

¶ 10 Appellants first contend the trial court lacked subject matter jurisdiction and Guaranty Association lacked standing to litigate the issue of reinsurance. They argue that under the Uniform Insurers Liquidation Act, 36 O.S.1981 §§ 1901 *et seq.*, the proper jurisdiction was in Arizona, the state of Great Global's domicile, and that the proper party to recover reinsurance proceeds was the domiciliary receiver in Arizona.

¶ 11 Appellants cite authority to support their assertion the domiciliary receiver is the sole successor of the insolvent insurer for purposes of receiving direct payment of reinsurance proceeds. It would follow then, under Appellants' assertion, that if the First Horizon–Great Global relationship was one of reinsurance, Appellants' obligation would be only to the domiciliary receiver, and Guaranty Association's claim would be against the domiciliary receiver.

¶ 12 Appellants' arguments, however, presuppose the relationship is one of reinsurance. It does not necessarily follow from Appellants' authority that only Great Global's state of domicile is the proper forum for litigating the question of whether that relationship exists. We find it can be argued with equal force that other jurisdictions, where an action may properly lie if the relationship is *not* reinsurance, also have the right to make that determination.

¶ 13 We do, though, find merit in Appellants' contention the trial court erred in ruling as a matter of law and fact that the relationship was not reinsurance. At trial, when both sides had rested after presenting their evidence, Guaranty Association moved for a directed verdict "on the issue that there is no reinsurance agreement," and further moved for directed verdict "that First Horizon Insurance Company, based upon the testimony and the evidence produced here, is the primary insurer...." The trial court held from the bench "there was no reinsurance contract", noting to Guaranty Association that it was "sustained in part and overruled in part."

¶ 14 Here on appeal Guaranty Association does not controvert Appellants' assertions regarding the effect if it was determined the First Horizon–Great Global relationship was one of reinsurance. Guaranty Association's argument is that the evidence supports the trial court's determination on that issue. However, in deciding a motion for directed verdict in an action of legal cognizance, determination of material issues must be left to the jury where there is conflicting evidence. *Lively v. Davis*, 1966 OK 11, 410 P.2d 851. The trial court should not direct a verdict if it is necessary to weigh the evidence to determine where the preponderance lies. *Id.*, at 857. In determining whether a party's evidence is sufficient to withstand a motion for directed verdict, the trial court must consider as true all evidence favorable to the party, with all reasonable inferences to be drawn from it, and disregard all conflicting evidence favorable to the movant. *Harder v. F.C. Clinton, Inc.*, 1997 OK 137, 948 P.2d 298.

¶ 15 In granting directed verdict on the issue of reinsurance, the trial court did not state the basis, or evidence, it relied upon in making the determination. Guaranty Association's motion for directed verdict does not provide any enlightenment. In its appellate brief, Guaranty Association, to support the trial court's determination, relies in large measure on the insurance policies issued to the Oklahoma insureds.

¶ 16 Guaranty Association asserts the policies are unambiguous, and as such, are to be construed as a matter of law by the court. *Max True Plastering Co. v. United States Fidelity and Guaranty Co.*, 1996 OK 28, 912 P.2d 861. The policy provision Guaranty Association relies on to prove First Horizon was a primary insurer is the endorsement making the Great Global workers' compensation policy subject to provisions of the accompanying First Horizon general comprehensive liability policy.

¶ 17 The question to be decided was whether First Horizon was a primary insurer in Oklahoma for workers' compensation insurance, or whether First Horizon was Great Global's reinsurer. Guaranty Association does not explain how the endorsement, considered within the four corners of the policies, unambiguously answers that question, and it is not self evident from our reading of the endorsement. The Great Global policy could have been made subject to the terms of the First Horizon policy for a variety of reasons. The endorsement may be evidence going to prove the question, but it is not determinative of it. The answer to the question lies only by referring to extrinsic evidence.

¶ 18 Guaranty Association goes to great lengths in its appellate brief to set forth the evidence it contends supports a finding the arrangement was not reinsurance. However, Appellants also submitted evidence they argue supports a finding the arrangement *was* reinsurance. Under the standards set forth above for determination of motions for directed verdict, this conflicting evidence should have gone to the jury. The trial court would have had to weigh the evidence in directing a verdict on Appellant's reinsurance defense. That is reversible er-

ror. *Lively v. Davis,* 410 P.2d at 857. Because of this holding, we need further address only those of Appellants' additional appellate propositions which go to the viability of Guaranty Association's claims.

■ ¶ 19 Appellants also contend Guaranty Association's claim for fraud was barred by the two year limitation period found at 12 O.S.1981 § 95(Third). That subsection provides that in an action for fraud the cause of action shall not be deemed to have accrued until the discovery of the fraud. Discovery, within the meaning of § 95, includes not only actual notice, but "such time as the defrauded party, by exercise of ordinary diligence, might have discovered such fraud." *Matter of Woodward,* 1976 OK 55, 549 P.2d 1207. The question of when fraud is discovered, or with reasonable diligence could have been discovered, is one of fact to be determined from surrounding circumstances, relationships of the parties, and all facts of the particular case. *Holmes v. McKey,* 1962 OK 278, 383 P.2d 655.

¶ 20 Appellants assert the § 95(Third) limitation period began to run in February 1987, when Guaranty Association began making payments on the "Great Global" claims, or, at the latest, in October 1987, when Guaranty Association "suspected problems" with those claims. Guaranty Association acknowledges it received general information in October 1987, and began an investigation, but argues it was not aware of the precise facts upon which its fraud claim is based until October 1988. Guaranty Association asserts that at the beginning of its investigation, neither it nor Great Global's receiver had complete sets of policy forms, which were being kept from the receiver by First Horizon and Napoleon.

■ ¶ 21 Guaranty Association filed its Petition in February 1990. Whether there was fraudulent concealment by First Horizon and Napoleon of facts relating to the cause of action, or whether Guaranty Association used due diligence to discover the alleged fraud, were questions of fact to be submitted to the jury. *Moses v. Miller,* 1950 OK ——, 216 P.2d 979. The jury, upon proper instruction, decided Guaranty Association's claim was not barred by the statute of limitations. There

was sufficient evidence to support the jury's determination. We may not disturb that decision.

¶ 22 Appellants next contend the trial court erroneously ruled Guaranty Association's Third Amended Petition related back to the original Petition. Appellants argue the fraud claim should be barred because Guaranty Association did not allege fraud with the requisite particularity until the Third Amended Petition, filed more than five years after the original Petition. Appellants further argue the Third Amended Petition improperly added an entirely new cause of action and source of damages, citing *Culver v. Mid–Continent Casualty Co.,* 1974 OK 79, 526 P.2d 496.

¶ 23 Guaranty Association responds the doctrine of relation back must be considered in view of the modern pleading code, enacted in 1984, long after *Culver* was decided. The relevant section of that code, 12 O.S.1991 § 2015(C)(2), provides:

> An amendment of a pleading relates back to the date of the original pleading when:
>
> (2) The claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; ...

¶ 24 In *Parker v. Elam,* 1992 OK 32, 829 P.2d 677, the Supreme Court discussed the *transactional* approach of applying the relation back doctrine, as that method is set out in § 2015(C)(2). The Supreme Court noted this approach ensures litigants may assert different theories of liability without violating the purpose of the statute of limitations— notice and opportunity to prepare a defense. The *Parker* Court held amendments to a petition relate back if they add a theory of liability which rests upon the same *operative events* originally pled.

■ ¶ 25 The most definitive operative event pled in the original Petition, and which remained as the factual gravamen of the amendments, was the creation of the fronting arrangement. The original Petition also alleged, *inter alia,* [1] the fronting arrangement was a "scheme" created to evade Okla-

homa's insurance licensing and self insurance laws, [2] that Appellants failed to account for the self insurance "loss pool" created under that scheme, while diverting and converting such funds to their own benefit, and [3] Appellants' action resulted in Guaranty Association's loss because it had to pay claims which were Appellants' responsibility.

¶ 26 Guaranty Association's Third Amended Petition was also grounded on the fronting arrangement. The facts supporting the fraud claim in that Petition were, in essence, Appellants' failure to reveal the true nature of the fronting arrangement. We find this latter claim rests upon the same operative event, and surrounding allegations, which was the basis for the claims in the original Petition. The trial court properly applied the doctrine of relation back in allowing the Third Amended Petition.

¶ 27 The trial court having properly ruled on relation back of the fraud claim in the Third Amended Petition, it was also proper, contrary to Appellants' contention, for the court to deny admission of the Petitions filed in this action, when Appellants offered them at trial. Appellants argued at trial the Petitions, including all amendments, were evidence of the untimeliness of the fraud claim.

¶ 28 Exclusion of evidence is a matter addressed to the sound discretion of the trial court, and we will disturb such ruling only where there is an abuse of that discretion. *American Biomedical Group, Inc. v. Norman Regional Hosp. Authority*, 1993 OK CIV APP 83, 855 P.2d 1074. Additionally, for reversal, there must be a strong showing of prejudice to the proponent of the evidence. *Id.*, at 1079.

¶ 29 We find no strong showing of prejudice by Appellants. Guaranty Association stipulated to the date the original Petition was filed. Further, Appellants cross-examined Guaranty Association's general manager and introduced documentary evidence with regard to actual and constructive notice of the events relating to the claims in the Petitions. Appellants have failed to show how any matter in the Petitions is not cumulative of evidence adduced at trial, or that which could have been adduced.

¶ 30 Finally, with respect to Guaranty Association's claims against Napoleon, Guaranty Association has failed to identify any duty Napoleon had to speak or assist in Association's investigation. There does not appear to be any evidence Napoleon's conduct "induced" Guaranty Association to pay claims. Rather, Guaranty Association began an investigation into the Great Global–First Horizon relationship, but decided to continue paying claims because of the court order and to avoid hardship on claimants. There is no evidence Guaranty Association ever stopped paying claims it felt obligated to pay, even after its investigation revealed the various relationships involved in this case. Thus, the judgment against Napoleon cannot stand.

¶ 31 The trial court's judgment is REVERSED. Upon REMAND, the trial court is directed to enter judgment in favor of Napoleon and to grant Classic a new trial consistent with the holdings in this opinion.

REVERSED AND REMANDED.

ADAMS, J., and BUETTNER, P.J., concur.